RUSSIE *et al.* v. BRAZZELL *et al.*, *Plaintiffs in Error.*

### Division One, March 30, 1895.

1. **Constitution:** AMENDMENT. A constitution adopted by the people can be changed, modified or amended only in the manner provided by the instrument itself.

2. ———: ———: RELIGIOUS SOCIETY. The constitution of a religious society, adopted by its general conference and acquiesced in for forty years, although it was never submitted to, or ratified by, the persons to be governed by it, and was never fully recognized by the entire body of the church, will be held to constitute the paramount law thereof, and can be changed or repealed only as provided in the constitution itself, and not by the conference or legislative body by which it was adopted.

3. ———: ———: ———. The method of amendment of the constitution of a religious society considered and *held* to be in substantial compliance with the provisions of such constitution.

4. ———: ———: ———. Where a constitution of a religious society provided that amendments thereto should be made on the request of two thirds of the society, a resolution of the general conference that two thirds of those voting should be taken as the request of two thirds of the members, is conclusive on the courts.

5. **Religious Society:** CONFESSION OF FAITH, CHANGE OF. A revised confession, merely setting out more fully and clearly the doctrines of a religious society, is not a change of its confession of faith.

6. ———: CONSTITUTION: AMENDMENTS: BALLOTS. A vote on proposed amendments to a constitution of a religious society will not be adjudged invalid on collateral attack on the ground that the ballots were unfair, in that all contained the word "yes," with directions that those voting in the negative should erase such word and insert the word "no."

*Error to Harrison Circuit Court.*

AFFIRMED.

*Wanamaker & Barlow* for plaintiffs in error.

(1) The church had a constitution in 1841; it remained identically the same until the alteration was effected in 1889. (2) The constitution of 1841 was recognized and treated by the church as its organic law for nearly fifty years. See *Bear v. Heasley*, 98 Mich. 279; *Schlichter v. Keiter*, 156 Pa. St. 119; *Philomath College v. Wyatt*, 31 Pac. Rep. 206. (3) Article 4 of the constitution provides that no alteration shall be made, "unless by two thirds vote of the whole society." It is altered and not in the mode provided. (4) The vote in favor of the amended constitution and revised confession of faith should have been "two thirds of the whole society," and not merely two thirds of those voting. *Bear v. Heasley*, 98 Mich. 279; *Philomath College v. Wyatt*, 31 Pac. Rep. (Ore.) 206; *State, etc., v. Sutterfield*, 54 Mo. 391; *State, etc., v. Brassfield*, 67 Mo. 331; *State, etc., v. Winkelmier*, 35 Mo. 103; *Webb v. Lafayette Co.*, 67 Mo. 353; *Ranny v. Bader*, 67 Mo. 476; *State, etc., v. Walker*, 85 Mo. 41. (5) The confession of faith has been materially changed. (6) The supreme court will take judicial notice of the difference between the religious doctrines embodied in the confession of faith of the church of the United Brethren and that of the new church. *Humphrey v. Burnside*, 4 Bush (Ky.), 215; *Young v. Ransom*, 31 Barb. 49. (7) Decisions of

·ecclesiastical tribunals are not conclusive on civil courts, where property rights are involved.    The constitution and confession of faith are as fully a part of every trust ·deed as if therein written.    *Prickett v. Wells*, 117 Mo. 502; *Watson v. Garvin*, 54 Mo. 353; *Smith v. Nelson*, 18 Yer. 511; *Smith v. Swormstedt*, 5 McLean, 388; *Rob-·ertson v. Bullions*, 9 Barb. 134; *Natal v. Gladstone*, 3 L. R. 1; *Kniskern v. Lutheran Church*, 1 Sandf. Ch. ·439; *Bear v. Heasley*, 98 Mich. 279; *Hochreiter's Appeal*, 93 Pa. St. 479; *Rottman v. Bartling*, 22 Neb. 373; *State ·v. Swift*, 69 Ind. 505.    The relations between the members of this association is one of contract, and the confession of faith and constitution constitute the terms of ·agreement, which is binding upon all.    *Bear v. Heasley*, .98 Mich. 279; *Hyde v. Woods*, 2 Sawy. 665; *White v. Brownell*, 2 Daly,329; *Ebbinghousen v. Worth Club*, 4 Abb. (N. C.) 300; *Baptist Church*, 25 Kan. 177; *State ·v. Williams*, 75 N. C. 134; *Innes v. Wylie*, 1. C. and K. 262; *Orickett v. Schaefer*, 11 Phila. 166; *Brine v. Board*, 2 Am. Law Reg. 268.    The edicts and declara-·tions of the conference (1889) contravened the organic laws of the society and are *ultra vires*.    *Bear v. Heasley*, 57 N. W. Rep. 270; *Philomath College v. Wyatt*, 31 Pac. Rep. 206.

*A. F. Woodruff, D. J. Heaston* and *L. B. Gunckel* ·for defendants in error.

(1)  Where a case is heard by the trial court, sitting as a jury, and no instructions are asked or given, if ·there is any theory of the law, based on the pleadings .and evidence, upon which the finding of the lower court can be sustained, the appellate court will adopt that theory.    *Garrison v. Lyle*, 38 Mo. App. 559; *Swayze v. Bride*, 34 Mo. App. 414; *McEvoy v. Lane*, 9 Mo. 48; .*Handlan v. McManus*, 100 Mo. 124; *Murdock v. Dalby*,

13 Mo. App. 42; *Zervis v. Unnerstall*, 29 Mo. App. 474; *Mead v. Spalding*, 94 Mo. 43; *Schnare v. Austin*, 106 Mo. 610; *Gruen v. Bamberger*, 25 Mo. App. 89; *Baird v. George*, 30 Mo. App. 505; *St. Louis v. Lanigan*, 97 Mo. 175; *Magee v. Burch*, 108 Mo. 336; *Brewing Co. v. Neiderweiser*, 28 Mo. App. 233. (2) A constitution is a written instrument agreed upon by the people; and is not operative until it is adopted by the people, not even when adopted by the convention authorized by law to form a constitution and specially called and elected for that purpose. Story on Constitution, 338; Jameson on Constitutional Convention, 494, 69, 71; Cooley on Constitutional Limitations, 3, 32; *People v. Railroad*, 24 N. Y. 486; *Parker v. Smith*, 3 Minn. 240; *Wells v. Bain*, 75 Pa. St. 40. (3) A constitution is not to be construed technically and strictly, like the statutes, nor against the plain and obvious dictates of reason, but liberally, so as to carry out its avowed objects and promote the ends of justice. Endlich on Statutory Interpretations, 711; *Commonwealth v. Maxwell*, 27 Pa. St. 460; *Mungeon v. People*, 55 N. Y. 613; Smith on Constitution and Statutory Construction, 695; *Taylor v. Taylor*, 10 Minn. 107; *Cass v. Dillon*, 2 Ohio St. 608; Story on Constitution, 141, 145, 156, 161; Cooley on Constitutional Limitations [1 Ed.], 58, 59, 61; Story's Commentaries on Constitutions (Abridged), sec. 194. (4) The general rule of law is that when a question is to be decided by the votes of a majority of the voters of a body or a territory this does not require that a majority of all the persons entitled to vote shall actually vote affirmatively, but only that the result shall be decided by a majority of the votes cast. *State v. Binder*, 38 Mo. 450; *State v. Penick*, 37 Mo. 270; McCreary on Elections, sec. 173; *Cass County v. Johnston*, 95 U. S. 369; *St. Joseph v. Rogers*, 16 Wall. 663; *County v. Johnson*, 5 Otto, 369;

*Wardens of Christ Church v. Pope,* 8 Gray, 140, 143;
*Walker v. Oswald,* 68 Md. 146; *Green v. Weller,* 32
Miss. 850; *Cons. Prob. Amdt. Cases,* 24 Kan. 700;
*Miller v. English,* 21 N. J. L. 317; *Church v. Church,*
2 Abb. Pr. (N. S.) 234; *People v. Gaines,* 47 Ill. 246;
*People v. Warfield,* 20 Ill. 163; *Railroad v. Davidson,*
1 Sneed, 692. (5) The rule has become elementary
that, when a civil right depends upon some matter per-
taining to ecclesiastical affairs, the civil tribunal tries
the civil right and nothing more, taking the ecclesias-
tical decisions out of which the civil right has arisen as
it finds them, and accepts such decisions as matters
adjudicated by another legally constituted jurisdiction.
*Quarterly Meeting, etc., v. Quarterly Meeting,* 89 Ind.
136; *Watson v. Jones, supra; Dwenger v. Geary,* 113
Ind. 106; *Connitt v. Church,* 54 N. Y. 551; *Gaff v.
Greer,* 88 Ind. 122; *Harrison v. Hoyle,* 24 Ohio St.
254; *Lamb v. Cain,* 129 Ind. 512; *Philomath College v.
Wyatt,* 31 Pac. Rep. 206; *Prickett v. Wells,* 117 Mo.
502; *Landis v. Campbell,* 79 Mo. 433; *Auracher v.
Yerger,* 58 N. W. Rep. (Iowa), 893; 1 High on Injunc-
tions, secs. 310, 314. (6) When there is a secession on
the part of members of a religious body or organization,
the seceders thereby forfeit all right to any part of the
church property. *Wiswell v. Church,* 14 Ohio St. 32;
*Church v. Wood,* 5 Ohio St. 283; *McGinnis v. Watson,* 41
Pa. St. 9; *Den. v. Bolton,* 12 N. J. L. 205; *Church v.
Theological Seminary,* 4 N. J. Eq. 77. (7) It was
entirely proper and legitimate for the general confer-
ence to appoint the commission to arrange the details,
within certain limits, of the request for vote upon con-
fession of faith and constitution. Such matters are
frequently done by legislative bodies, and approved by
the courts. *Schweiker v. Husser,* 146 Ill. 425; *Territory
v. Scott,* 20 N. W. Rep. (Dak.), 401; *State ex rel. v.*

*Railroad*, 37 N. W. Rep. (Minn.), 782; *Granger Cases*, 94 U. S. 113–187; *People v. Harper*, 91 Ill. 357; *Railroad v. Smith*, 70 Ga. 694; *State ex rel. v. Medical Ex.*, 34 Minn. 387. (8) Civil courts in this country have no ecclesiastical jurisdiction. They can not revise or question ordinary acts of church discipline, and can only interfere in church controversies, when civil rights or the rights of property are involved. *Donovan v. Chatard*, 97 Ind. 421; *White Lick Quaker Case*, 89 Ind. 136; *Gaff v. Greer*, 88 Ind. 122; *Watson v. Jones*, 13 Wall. 679, 727; *Auracher v. Yerger*, 58 N. W. Rep. 893; *Schweiker v. Husser*, 34 N. E. Rep. 1022; *Lamb v. Cain*, 129 Ind. 512, 513; *Dwenger v. Geary*, 113 Ind. 106; *Earle v. Wilson*, 8 Cush. 456; *Connitt v. Reformed Church*, 54 N. Y. 551; *Church v. Halverson*, 42 Minn. 503; *Landis v. Campbell*, 79 Mo. 433; *Church v. Church*, 23 Iowa, 567; *Church v. Seibert*, 3 Pa. St. 291; *State ex rel. v. Farris*, 45 Mo. 184; *Stack v. O'Hara*, 90 Pa. St. 477; *Schlichter v. Keiter*, 156 Pa. St. 119, 144. (9) A legislative body can not, at one session, enact laws which will limit or abridge the legislative power vested in this body at any subsequent session, or make an act irrepealable, except it assume the form and substance of a contract; and to call it a constitution would not change this well known principle. *Bloomer v. Stolley*, 5 McLean, 158; *Plank Road v. Husted*, 30 Ohio St. 581; *Harrison v. Hoyle*, 24 Ohio St. 301; *State v. Swift*, 69 Ind. 520; Cooley on Constitutional Limitation, 4, 149; *Mungeon v. People*, 55 N. Y. 613; *Mott v. Railroad*, 30 Pa. St. 9.

MACFARLANE, J.—This suit is ejectment to recover possession of certain lots at Eagleville, Harrison county. The title to the lots is vested in trustees for the use of the "United Brethren in Christ," by deed dated February 10, 1873. The property was used by the congre-

gation of said church as a parsonage.  The controversy grows out of a division in the church and said congregation, which occured in 1889.  The plaintiffs are the trustees of the branch known as liberals, and defendants are trustees of the branch known as radicals. Each claims the property as trustees of the church.

"The United Brethren in Christ" is a voluntary unincorporated religious denomination.  At its first organization, something over a century ago, it had neither a constitution nor a confession of faith.  It looked to the Bible alone for doctrine and government. In 1815, the general conference, which was the highest legislative and judicial body of the church, adopted a confession of faith which contained the fundamental doctrines of the church, and which was recognized and adhered to until 1889.  The general conference in 1841 formulated and adopted a constitution as the organic law of the church.  This constitution recognized the confession of faith adopted in 1815, and provided, among other things, that, "no rule or ordinance shall at any time be passed to change or do away with the confession of faith as it now stands."  It also provided: "There shall be no connection with secret combinations."  Article 4 provided:  "There shall be no alteration of the foregoing constitution, unless by request of two thirds of the whole society."  There was no submission of this constitution to a vote of the members of the society, and the regularity of its adoption is, and from its date has been, questioned.

In May, 1885, the general conference adopted the following resolutions, by a vote of 78 to 42:

"Whereas, our confession of faith is silent or ambiguous upon some of the cardinal doctrines of the Bible, as held and believed by our church; and

"Whereas, It is desirable and needful to so amend and improve our present constitution as to adapt its

provisions more fully to the wants and conditions of the church in this and future time, therefore,

"Resolved, by the delegates of the annual conferences of the church of the United Brethren in Christ, in general conference assembled, that a church commission, composed of twenty-seven persons, and consisting of the bishops of the church, and ministers and laymen appointed and elected by this body, an equal number from each bishop's district—provided that the Pacific district shall have two members besides its bishop—be and is hereby authorized and established.

"The duties and powers of this commission shall be to consider our present confession of faith and constitution, and prepare such a form of belief and such amended fundamental rules for the government of this church in the future as will, in their judgment, be best adapted to secure its growth and efficiency in the work of evangelizing the world.

"Provided, that this commission shall preserve unchanged in substance the present confession of faith, so far as it is clear. 2. That it shall also retain the present itinerant plan. 3. It shall keep sacred the general usages and distinctive principles of the church on all great moral reforms, as sustained by the word of God, in so far as the province of their work may touch them.

"Provided, further, that, in the final adoption, as a whole, of a confession of faith and constitution for submission to the church by the commission, a majority vote of all the members composing the commission shall be necessary.

"Resolved, that this commission shall meet at such time and place as the board of bishops may appoint, and is expected to complete its work by January 1, 1886.

"The commission shall also adopt and cause to be executed a plan by which the proposed confession of faith and constitution may receive the largest possible attention and expression of approval or disapproval by our people, including all necessary regulations for taking, counting, and reporting the vote.

"Resolved, that when, according to the foregoing provisions, the result of the vote of the church shows that two thirds of all the votes cast have been given in approval of the proposed confession of faith and con-stitution, it shall be the duty of the bishops to publish and proclaim said result through the official organs of the church.   Whereupon, the confession of faith and constitution thus ratified and adopted shall become the fundamental belief and organic law of this church.

"Provided, further, that the adoption of the constitution as aforesaid shall in no wise affect any legislation of this general conference for the coming quadrennium."

A recommendation that the following law in relation to secret combinations was also adopted.

"A secret combination, in the sense of the constitution, is a secret league or confederation of persons holding principles and laws at variance with the word of God, and infringing upon the natural, social, political, or religous rights of those outside its pale.

"Any member or minister of our church found in connection with such combination shall be dealt with as in other cases of disobedience to the order and discipline of the church in case of members, as found on page 23 of discipline in answer to the third question of section 3, chapter IV., and in case of ministers, as found in chapter VI., section 13, page 65."

Pursuant to these resolutions a commission provided therein was duly appointed.   The commission so appointed prepared a revised confession of faith and an

amended constitution.   These were submitted to a vote
of the members of the society under methods adopted
by the commission.   The vote was taken in November,
1888, after all reasonable endeavors to enlighten the
membership through official organs, and by pamphlets,
and by pulpit announcements.   The vote as taken was
as follows.

For the confession of faith ..................................... 51,070
Against ..................................................... 3,310
For the amended constitution ............................. 50,685
Against ..................................................... 3,659
For lay delegation ......................................... 48,825
Against ..................................................... 5,634
For section on secret combinations ....................... 46,994
Against ..................................................... 7,298

At the time this vote was taken the membership
exceeded 200,000.

The revised confession of faith and amended con-
stitution were reported to the general conference in
1889 and adopted by a vote of 110 to 20, and were pro-
claimed by the presiding bishop to be the confession of
faith and the constitution of the Church of the United
Brethren in Christ.

After the proclamation of the bishop fifteen mem-
bers of the conference, including one bishop, withdrew
to another room, elected a secretary, and passed a reso-
lution declaring that by their action the other members
had vacated their seats.   Each body thereafter acted
independently as the general conference, and since
then there have existed two separate and distinct
bodies, each having a complete general and local organ-
ization, and each asserting that it is the Church of the
United Brethren in Christ.

The plaintiffs are trustees of the majority, or lib-
erals, as they are called, and defendants are trustees
elected by the minority or radical party.   Each claims
the property as the trustees of the true church.

The revised or new confession contains thirteen articles. The changes made are given below. The words in parentheses were in the old confession, but are not contained in the new. The words in italics were not in the old, but have been added to the new:

"Article 2. We believe that this triune God created the heavens and the earth, and all that in them is, visible and invisible (and, furthermore, sustains, governs, protects, and supports the same); *that He sustains, protects and governs these with gracious regard for the welfare of man, to the glory of His name.*

"Art. 3. We believe in Jesus Christ; that He is very God and man; that he became incarnate by power of the Holy Ghost (in the Virgin Mary), and was born of (her) *the Virgin Mary;* that He is the Savior and Mediator of the whole human race, if they, with full faith (in Him), accept the grace proffered in Jesus; that this Jesus suffered and died, * * * and will come again at the last day, to judge the (quick) *living* and the dead.

"Art. 4. We believe in the Holy Ghost; that He is equal in being with the Father and the Son; *that He convinces the world of sin, of righteousness, and of judgment;* that he comforts the faithful, and guides them into all truth.

"Art. 5. We believe that the Holy Bible, Old and New Testaments, is the word of God; that it (contains) *reveals* the only true way to our salvation; that every true Christian is bound to acknowledge and receive it (with the influence) *by the help* of the spirit of God, as the only rule and guide *in faith and practice* (and that, without faith in Jesus Christ, true repentance, forgiveness of sins, and following after Christ, no one can be a true Christian. We also believe that what is contained in the holy Scriptures, to wit, the fall in

Adam and redemption through Jesus Christ, shall be preached throughout the world.)

Art. 6. We believe in a holy Christian church (the communion of saints, the resurrection of the body, and life everlasting) *composed of true believers, in which the Word of God is preached by men divinely called, and the ordinances are duly administered; that this divine institution is for the maintenance of worship, for the edification of believers, and the conversion of the world to Christ.*

"Art. 7. We believe that the (ordinances) *sacraments,* baptism and (the remembrance of the sufferings and death of our Lord Jesus Christ) *the Lord's supper,* are to be in use *in the church,* and *should be* practiced by all (Christian societies) *Christians,* (and that it is incumbent on all the children of God particularly, to practice them); but the (manner in which ought) *mode of baptism, and the manner of observing the Lord's supper, are* always to be left to the judgment and understanding of every individual. *Also the baptism of children shall be left to the judgment of believing parents.* The example of the washing of feet is to be left to the judgment of each one, to practice or not; (but it is not becoming of any of our preachers or members to traduce any of their brethren whose judgment and understanding in these respects is different from their own, either in public or in private. Whosoever shall make himself guilty in this respect shall be considered a traducer of his brethren, and shall be answerable for the same.)

"*Art. 8. We believe that man is fallen from original righteousness, and, apart from the grace of our Lord Jesus Christ, is not only entirely destitute of holiness, but is inclined to evil, and only evil, and that continually; and that, except a man be born again, he can not see the kingdom of heaven.*

"*Art. 9. We believe that penitent sinners are justified before God, only by faith in our Lord Jesus Christ, and not by works; yet that good works in Christ are acceptable to God, and spring out of a true and living faith.*

"*Art. 10. We believe that regeneration is the renewal of the heart of man after the image of God, through the Word, by the act of the Holy Ghost, by which the believer receives the spirit of adoption, and is enabled to serve God with the will and the affections.*

"*Art. 11. We believe that sanctification is the work of God's grace, through the Word and the spirit, by which those who have been born again are separated in their acts, words and thoughts from sin, and are enabled to live unto God, and to follow holiness, without which no man shall see the Lord.*

"*Art. 12. We believe that the Christian Sabbath is divinely appointed; that it is commemorative of our Lord's resurrection from the grave, and is an emblem of our eternal rest, that it is essential to the welfare of the civil community, and to the permanence and growth of the Christian church; and that it should be reverently observed as a day of holy rest, and of social and public worship.*

"*Art. 13. We believe in the resurrection of the dead, the future general judgment, and an eternal state of rewards, in which the righteous dwell in endless life, and the wicked in endless punishment.*"

This arrangement is adopted from *Bear v. Heasley*, 98 Mich. 300 and 301.

The old constitution provided that the general conference "shall consist of elders, elected by members of every conference district throughout the society." The new provides that the general conference shall consist of elders and laymen elected in each annual conference district throughout the church. The num-

ber and ratio of laymen and the mode of their election shall be determined by the general conference." It provides further that: "The ministerial and lay delegates shall deliberate and vote together as one body; but the general conference shall have power to provide for a vote by separate orders whenever it deems it best to do so; and in such cases the concurrent vote of both orders shall be necessary to complete an action."

Section 10, article 1, provides that: "The general conference may—two thirds of the members elected thereto concurring—propose changes in, or additions to, the confession of faith; *provided*, that the concurrence of three fourths of the annual conference shall be necessary to their ratification." On the subject of secret combinations, it declares: "We declare that all secret combinations which infringe upon the rights of those outside their organization, and whose principles and practices are injurious to the Christian character of their members, are contrary to the word of God, and that Christians ought to have no connection with them. The general conference shall have power to enact such rules of discipline with respect to such combinations as in its judgment it may deem proper."

Section 1, article 5, is as follows: "Amendments to this constitution may be proposed by any general conference—two thirds of the members elected thereto concurring—which amendments shall be submitted to a vote of the membership throughout the church, under regulations authorized by said conference. A majority of all the votes cast upon any submitted amendment shall be necessary to its final ratification."

These constitute the material changes in the constitution.

The question presented by this record is, which party represents the true church of the United Brethren in Christ, defendants, who adhere to the old constitu-

tion and confession of faith, or the plaintiffs, who have accepted and are governed by the revised confession and new constitution. Defendants insist that the distinguishing doctrines of the church and its fundamental law have been so changed by the revision and amendments, that the identity of the church has been entirely lost, and also that the proceedings under which the changes were effected, were unauthorized, irregular and void, and the constitution and confession adopted thereunder have no binding force or validity. The issues thus present two principal questions: *First,* were the amendments and revision legally made. *Second,* were the changes in the confession of faith such as to destroy the distinctive theological character of the church.

I. Plaintiffs insist, in the first place, that the constitution of 1841, adopted, as it was, by the general conference, and not having received the sanction and approval of the people, the source from which all constitutions emanate, had only the force and effect of a legislative enactment, and was subject to change or repeal by the legislative body which gave it life.

While it is true that this constitution was not submitted to, or ratified by, the people to be governed by it, and its force was never fully recognized by the entire body of the church, yet it was certainly a compact which was accepted and unchanged for some forty years. Every person who joined the society accepted its provisions and was entitled to demand all the rights it guaranteed. It should, therefore, be held to constitute the paramount law of the society, so long as it remained unchanged and unrepealed.

It is well settled that a constitution adopted by the people can only be changed, modified, or amended in the manner provided by the instrument itself. No valid reason can be found why this voluntary compact

should be susceptible of change in any manner, other than that required of constitutions regularly adopted. It was in effect, and will be treated as, the constitution of the church.

II. The question, then, is, was this constitution of 1841 amended in the manner therein prescribed? That instrument declares that "there shall be no alteration of the foregoing constitution, unless by request of two thirds of the whole society." The committee appointed by the general conference of 1885, to which was referred this question of amendment of the constitution, in speaking of this provision, truly said: "Its language and apparent meaning is so far reaching as to render it extraordinary and impracticable as an article of constitutional law."

Since 1841 the membership has increased from a few thousand to over 200,000 and the society itself has been extended from a mere local organization, until its congregations and conferences are found in many of the states. What might have been practicable in requesting changes when the members of a voluntary organization were all in one locality, would be wholly impracticable when the membership was scattered from Maryland and Pennsylvania to Oregon and California. In the latter condition it is evident that the members could only be effectively reached and their wishes ascertained through the means afforded by the organization itself. The right to make changes in the constitution is clearly recognized. In order to effect them, action on the part of both the members and the general conference is required. Such construction should be given as will make the provisions of the constitution practicable.

"No construction of a given power is to be allowed which plainly defeats or impairs its avowed objects. If, therefore, the words are plainly susceptible of two

interpretations, according to their common sense and use, the one of which would defeat one or all of the objects for which it was obviously given, and the other of which would preserve and promote all, the former interpretation ought to be rejected and the latter be held the true interpretation." Story, Com. on Con. (Abridged) sec. 194.

"Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and un-learned, may be able to trace the leading principles of government." Cooley, Const. Lim., 73; *Gibbons v. Ogden*, 9 Wheat. 188.

The intention of the conference in ordaining this provision of the constitution was only that changes should not be made without the consent of two thirds of the members. No method of ascertaining that consent or of proposing amendments was provided in the constitution. It seems to us that the only practical method was that adopted by the conference, and no valid objection can be urged against it. A vote of the members to proposed amendments is the usual, common sense and practicable way of ascertaining their will.

III. The general conference of 1885 by its resolution, providing for submission of the amendment, declared that, if two thirds of those voting on the proposition vote in favor of the change, such vote should be taken as a request of two thirds of the members. There is no doubt that those voting in favor of the amendments greatly exceeded two thirds of the entire vote cast. But it is insisted that there could be no valid and binding request, unless made by an affirmative vote of two thirds of all the members of the society, and that the resolution, making sufficient a

request of two thirds of those voting, is contrary to the express mandate of the constitution.

There is no doubt of the general rule as given by McCrary in his work on Elections (sec. 173): "Where a statute requires a question to be decided, or an officer to be chosen, by the votes of 'a majority of the voters of a county,' this does not require that a majority of all persons in the county entitled to vote shall actually vote affirmatively, but only that the result shall be decided by the majority of the votes cast, provided, always, that there is a fair election, and an equal opportunity for all to participate. In such a case the only proper test of the number of persons entitled to vote is the result of the election as determined by the ballot box, and the courts will not go outside of that to inquire whether there were other persons entitled to vote, who did not do so. * * * This doctrine is well settled by the authorities."

The question of the sufficiency of this vote to express a request of two thirds of all the members came before the supreme court of Pennsylvania in a recent case, where it was said: "It is said that some refrained from voting because of objection to the proposed revision, or the mode of proceeding to ascertain the wish of the society. If so, it was an ineffectual kind of opposition. In all elections the nonvoting must be counted as willing to be bound by the action of the majority of those who vote. Any other rule would lead to interminable trouble and uncertainty. (*Craig v. The Presbyterian Church*, 88 Pa. St. 42.) In elections, under the laws of the states or the United States, this has never been doubted." *Schlichter v. Keiter*, 156 Pa. St. 145, 146.

This ruling was followed by the supreme court of Illinois in *Kuns v. Robertson*, 154 Ill. 394.

On the same question it was said by the supreme court of Indiana: "But we are of the opinion that the number of votes cast at the election is to be considered, for the purposes of this case, as constituting the number of the legal voters belonging to the church. Any other rule would be impracticable, and would lead to endless confusion and contention." *Lamb v. Cain*, 129 Ind. 516.

This general rule has been followed and approved by this court. *State v. Binder*, 38 Mo. 450; *State ex rel. v. Renick*, 37 Mo. 270. See, also, to same purport, cases from other states cited in brief of counsel.

But defendants insist that there are exceptions to the general rule, within which this case falls, and cite cases decided by this court in which it was held that the general rule does not apply under similar constitutional or legislative provisions in case the entire number is known from recent registrations; or from the number of votes cast at the same election; or where there is no difficulty in ascertaining the total number of voters. *State ex rel. v. Sutterfield*, 54 Mo. 391; *State ex rel. v. Brassfield*, 67 Mo. 331; *State ex rel. v. Harris*, 96 Mo. 29; *State v. Winkelmeier*, 35 Mo. 103.

Now it appears, from the year books of the church, that the total membership, at the time the vote was taken, was over 200,000. It was also shown that under the customs and rules of the church, all members in good standing were entitled to vote at all elections, except, perhaps, children under a certain age. It is argued from this that the total number of voters was fairly ascertainable, and an affirmative vote of two thirds of the entire membership was necessary to effect a valid change in the constitution.

But the question, we think, is whether the rule promulgated by the general conference for ascertaining the vote necessary was valid and binding upon the civil

courts. It was general and was intended to bind the members in whatever state they might have their membership. As has been seen, it was not in contravention of the general laws of the land.

It was said in the recent case of *Prickett v. Wells*, 117 Mo. 502: "The people of that society," (which was a Congregational church) "in the exercise of their religious liberty, had the undoubted right to adopt rules for their own church government, if not inconsistent with the laws of the land. In adjusting their respective claims to the use of church property, as between themselves, the civil courts will give effect to those rules, subject to the qualification just adverted to."

In another case it was agreed "that, according to the rules governing the church, a majority of those present and voting at a regular meeting should govern, and its action is binding upon the whole body." It was accordingly held that a majority vote, taken according to the customs and rules of the church, authorized an incorporation of the body, and the transfer of the property of the congregation to the corporation, though a majority of all the members did not vote in favor of the proposition. *North St. Louis Christian Church v. McGowan*, 62 Mo. 279.

The general conference of the United Brethren, being the highest legislative and judicial body of the church, declared that an affirmative vote of two thirds of those voting on the amendments should be taken as a request of two thirds of all the members. This resolution must be taken, not only as expressive of the rules and customs of the church, but as also declaring what vote should be required on the questions submitted. The civil courts should take this action of the conference as conclusive.

It seems that notice of the election, the manner in which the vote should be taken, as well as the effect of a failure to vote, was given through the church papers, by plaintiffs, and from the pulpits. The questions to be voted upon were thoroughly discussed throughout the various local conferences, and every member had ample opportunity to vote intelligently, and to know that a failure to vote would be counted as a vote in favor of the amendments. We are, therefore, of the opinion that the general conference had the power to prescribe the rules for submitting the proposed amendments to the vote of the members, and that the method adopted was not contrary to the laws of the land or the provisions of the old constitution.

IV.   Section 4, article 2, of the constitution of 1841, provided that "no rule or ordinance shall, at any time, be passed to change or do away with the confession of faith as it now stands; nor the itinerant plan." Under the resolutions providing for a commission to propose amendments it was also expressly provided "that this commission shall preserve, unchanged, the present confession of faith so far as it is clear." The provision for taking the vote of the members on revision of the confession was the same as that providing for amending the constitution, and need not be further considered. The question on this branch of the case is, did the revised confession, as requested by the members and adopted by the general conference, so change the distinctive doctrines of the church as to destroy its identity, and operate as a perversion of the trust under which the property in question was held? However embarrassing it may be, it becomes our duty to determine this question. The action was one at law. The question thus raised is one of fact, which was passed upon by the circuit court without declarations

of law, and the conclusion reached is binding upon this court, unless the finding was clearly erroneous. *Mead v. Spalding*, 94 Mo. 47, and cases cited.

On this question the opinion of the Pennsylvania court so clearly expresses the conclusions we have reached, that we content ourselves with quoting at large from it:

"We have attentively considered the suggestions made to us on this subject by the appellant; we have examined the old and the revised confessions; we have read the testimony of the distinguished theological experts who were called to testify as to the alleged doctrinal differences, and we are satisfied that the master and the court were right in denying the sixth proposition. There has been no substantial departure from the ancient beliefs of the church. The revision is simply a clear and ample statement of the great doctrines that are to be found in the creed of 1815, or that logically result from them. The 'general usages and distinctive principles of the church' are preserved. Identity in both polity and creed are undisturbed. We feel the more satisfaction with this conclusion, since it is in harmony with that reached by the court of last resort in matters of faith and discipline, within the church itself, viz., the general conference; and with the conclusion reached by a clear majority of the entire membership. If the question was one of doctrine alone, we should feel inclined to treat the decision of the general conference as final, in accordance with the rule laid down in several cases, among which are *App v. Lutheran Congregation*, 6 Pa. St. 201; *German Reformed Church v. Seibert*, 3 Pa. St. 282; *McGinnis v. Watson*, 41 Pa. St. 9.

"Two of the questions raised by the defendants' propositions remain to be briefly considered: *First.* Was the confession of faith absolutely unchangeable

under the constitution of 1841? *Second.* If not, was the change made in 1889 so made as to have a binding force upon the church? The appellants' argument upon the first of these questions rests on section 4 of article 2 of the constitution of 1841. It is as follows: 'Sec. 4. No rule or ordinance shall at any time be passed to change or do away with the confession of faith as it now stands, nor to destroy the itinerant plan.' This provision is not to receive a technical interpretation, but is to be construed in the light which the whole instrument throws upon it, and so as to advance the interests of the church and promote its objects. *Monongahela Nav. Co. v. Coons,* 6 W. & S. 114; *Commonwealth v. Clark,* 7 W. & S. 127; *Commonwealth v. Hartman,* 17 Pa. St. 119; *Commonwealth v. Maxwell,* 27 Pa. St. 444. The purpose and effect of section 4, when so construed, is not to prohibit changes in the confession of faith that are in the interest of clearness of expression, or fullness of statement, of the accepted doctrines of the church, but to prevent changes in the doctrines to which the church was committed. The provision was not intended as an impassable barrier thrown in the way of improvement of all sorts, but as a protection against the introduction of heretical doctrine, destructive of the distinctive theological character of the church. It follows that the changes made in 1889 were not within the prohibition of this section, since they are shown to be changes in statement in the interest of clearness and completeness of declaration of belief in the doctrines actually held by the church, and which are found less fully stated in the confession prepared in 1845.

"The contention of the appellant upon this subject fails, therefore, for this reason: The confession of faith was not 'absolutely unchangeable' in its manner of expressing the doctrines held by the church. It was

unchangeable so far as relates to the distinctive doctrines or principles actually embodied in it." *Schlichter v. Keiter, supra.*

The supreme court of Illinois, *supra*, says:

" 'There must be a real and substantial departure from the purposes of the trust—such an one as amounts to a perversion of it to authorize the exercise of equitable jurisdiction in granting relief' *(Happy v. Morton, supra)*. It, therefore, follows that, though there be a change in church policy—or alteration in the expressed form of faith, if the substantive theological doctrine and the general polity be retained—there is no such departure as would amount to a misuse or perversion of the trust. In this case, not only the denominational name, but the cardinal doctrines of faith the general usages and distinctive principles of the church were preserved. The revised confession of faith expresses with greater clearness, exactness and perspicuity of statement the belief of the church, while the amended constitution, retaining the general policy of the church, was more logical, more in keeping with the present age, more explicit and definite. No change whatever was made in the belief, teachings, or practice of the church in anywise affecting its fundamental doctrine or policy. The substance was retained, and the form and manner of expressing it was altered and improved."

The same conclusion was reached in *Lamb v. Cain*, 129 Ind. 517, though by a different course of reasoning, holding that the judgment of the general conference, that the revised confession and amended constitution was in fact the fundamental belief and constitution of the church, was conclusive upon the civil courts.

V. Objection is made to the unfairness of the ballots prepared and furnished the members by the

Russie v. Brazzell.

committee on revision.   These ballots were in the following form:

"BALLOT ON AMENDMENTS TO THE CONSTITUTION.

Members wishing to vote *No* on either proposition must erase the word YES and insert *No.*

| | |
|---|---|
| Confession of faith, | Yes. |
| Amended Constitution, | Yes. |
| Lay delegation, | Yes. |
| Section on Secret Combinations, | Yes. |

It may be readily seen that this ballot insured the greatest possible vote in favor of the proposition submitted. Indeed, the method adopted has the appearance of unfairness, notwithstanding the instruction placed upon the ballot itself.   But it is only necessary to say that the votes as deposited were received and counted by the tellers, and the vote thus taken and reported to the general conference was approved and acted upon by it.   This is not a contest over that election, but is collateral to it.   The vote as accepted and counted by the proper tribunal must be taken in this proceeding as regular and lawful.   Judgment affirmed.   All concur.