[S. F. No. 5062.    In Bank.—December 24, 1909.]

THE PERMANENT COMMITTEE OF MISSIONS OF THE PACIFIC SYNOD OF THE CUMBERLAND PRESBYTERIAN CHURCH IN UNITED STATES, Appellant, v. THE PACIFIC SYNOD OF THE PRESBYTERIAN CHURCH, U. S. A., THE CALIFORNIA SYNOD OF THE PRESBYTERIAN CHURCH, U. S. A., et al., Respondents.

RELIGIOUS SOCIETIES—UNION OF CUMBERLAND PRESBYTERIAN CHURCH AND PRESBYTERIAN CHURCH—CREED HARMONIZED.—The Cumberland Presbyterian Church and the Presbyterian Church, having each a presbyterian form of church government, and all differences of religious creed which gave rise to the Cumberland Presbyterian Church having been fully harmonized, it was within the constitutional power of two thirds of the general assembly of each body to agree upon a basis of union to be approved by a majority of the presbyteries of each body, and upon such approval to unite the churches under the name of the "Presbyterian Church."

ID.—FAILURE TO SUBMIT UNITED NAME TO PRESBYTERIES—NAME "CUMBERLAND" NOT ESSENTIAL—POWER OF GENERAL ASSEMBLY.—The failure to submit with the plan of union the united name of the "Presbyterian Church" agreed upon cannot affect the validity of the reunion, where it appears that the name "Cumberland" had a purely local origin and was no essential part of the church structure or government, and was not expressly made a part of its constitution. The obvious inference is that the general assembly of the "Cumberland" Presbyterian Church had power to change its name by omitting that word without submitting the same to the approval of its presbyteries.

ID.—EFFECT OF FORMAL ADOPTION OF UNION UPON CHANGE OF NAME.—The formal declaration of the general assembly of the "Cumberland" Presbyterian Church, that the entire plan of union had been constitutionally adopted, could be true with respect to the change of name only upon the theory that the question put to and affirmed by the presbyteries included an approval of the proposed change of name, or upon the theory that presbyterial approval thereof was unnecessary.

ID.—QUESTION OF ECCLESIASTICAL JURISPRUDENCE — CONCLUSIVE DECISION.—Such declaration was equivalent to a decision that one of such two theories was correct.   This being a matter solely of ecclesiastical jurisprudence, the decision of the assembly, the highest authority of the church, is conclusive upon all civil courts.

ID.—TERMS OF UNION—"ECCLESIASTICAL STANDARDS"—CHANGE OF NAME IMPLIED.—The two Presbyterian bodies having been originally one, and the "Cumberland Presbyterian Church" having been formed by members of the "Presbyterian Church" on the ground of dissent as to creed, and the proposed union being on the basis of the now harmonious "ecclesiastical standards" of the "Presbyterian Church," a change of name of the "Cumberland Presbyterian Church" is implied in such basis of reunion. A contrary contention would make the name "Cumberland" an "ecclesiastical standard" of the "Presbyterian Church."

ID.—FAILURE TO SPECIFY NAME NOT VITAL TO OPERATION AND EFFECT OF UNION.—The failure to specify any name by which the two churches were to be known was not vital to the plan of union or to its operation and effect.   The name of the united church would, in such case, be matter for further consideration by the united church. If the name has not been properly submitted to the presbyteries, and such submission is necessary, then a name can now be adopted by the general assembly and presbyteries of the united church.

ID.—LEGALITY OF UNION—LONG AND FULL DISCUSSION OF PLAN—UNITED NAME FULLY UNDERSTOOD—PRESBYTERIAN USAGE.—Where there was no element of fraud, deception, or concealment in the proposed plan of reunion, and it had been a matter of long and full discussion for several years, and the entire plan proposed, without any lack of understanding that the church name was to be that of

the old church, if the reunion was effected, was considered and fully debated in all its parts before the final action of the presbyteries and the final adoption of the plan by the general assemblies, and there was no substantial departure from immemorial Presbyterian usage or from the constitution of the Cumberland Presbyterian Church, the union effected must be regarded as legal and effective.

ID.—VOTES OF MEMBERS OF INDIVIDUAL CHURCHES NOT REQUIRED.— No formal vote of the members of the individual churches was necessary to the exercise of the powers conferred upon the assembly and presbyteries; but the sovereign powers vested in them as representative bodies are, when exercised, binding upon all the members of the Presbyterian Church, whether the result is satisfactory to them or not.

ID.—RELATION OF MEMBERS OF CHURCHES TO HIGHER CHURCH COURTS.— When a person joins a church or congregation associated for religious worship, under the supervision and control of higher church courts, he necessarily by that act agrees to abide by its rules of government and the judgments of its courts regularly made, and consents that all of his rights, privileges, and duties as a member, or in respect of his membership, shall be governed and controlled by those rules and judgments; and this agreement is always implied from the fact of membership.

ID. — PRESBYTERIAN GOVERNMENT REPRESENTATIVE. — The Presbyterian government is representative in character, and the members exercise their will so far as they may under the Presbyterian system in choosing their ruling elders and selecting one of them as representative to the presbytery; and this representative government being the recognized rule of the church, there is no violation of the compact between the church and its members in the action of the presbyteries and general assemblies as representative bodies.

ID.—EFFECT OF UNION—IDENTITY OF CHURCHES AND REPRESENTATIVE BODIES UNCHANGED.—The effect of the union of the independent Presbyterian bodies into one body was not to lose the identity of the churches, presbyteries, and synods of either body. These remain the same as before the union, the main difference being that they belong to a larger body and have relatively less influence and power in affairs affecting the whole united church. The entire church continues to exist, not separately and distinctly, but in union and association with the other church. Neither of them has now a separate existence, one no more than the other.

ID.—BASIS OF UNION—RESULT—PROCESS—POWER OF FORMATION.—The basis of the union is sufficiently clear and distinct, in making "the ecclesiastical standards of the Presbyterian Church" the basis thereof, which includes the doctrine, form of govenment, and everything pertaining thereto, and by these the two bodies become one. Whether the process is called an amendment of the old constitution, or the adoption of a new one, which in effect would be a "change," the intent is clearly manifest; and the church authorities concerned

had the power to proceed as they did. The power to form a union is included in the absolute sovereign power vested in these church courts by Presbyterian usage and declared in the constitution thereof.

ID.—DONATIONS TO "CUMBERLAND PRESBYTERIAN CHURCH"—TRUST NOT SHOWN TO BE VIOLATED—PROPERTY NOT AFFECTED BY UNION.—The fact that donations of property were made specifically to the "Cumberland Presbyterian Church," as a denomination, cannot affect the validity of the union as respects any general trust created by such donations, for the reasons that the identity of its synods, presbyteries, church sessions, and church property is not lost, but still continues under the united name of "Presbyterian Church"; that the union effected is not of a different or distinct denomination, and that there is no evidence that any part of the fund or property was given on the specific trust that the church shall retain the name "Cumberland."

ID.—RIGHTS OF DONORS NOT PARTIES TO ENFORCE TRUST UNAFFECTED BY JUDGMENT.—If any property was in fact given and held upon the specific trust that the word "Cumberland" should be retained as part of its distinctive name, or for the purpose of aiding in teaching the exact form or statement of the creed thereof found in the "Cumberland" constitution at the time of such donation, the rights of such donors, who are not parties to this action, to enforce a trust cannot be affected by the decision and judgment in this case.

ID.—FINDING AS TO PROPERTY—ABSENCE OF SPECIFIC TRUST—PRESUMPTION OF KNOWLEDGE OF POWER OF CHANGE.—The court's finding, that the property claimed by plaintiff distinctively as a specific trust consists of houses of worship held for the members of the local churches respectively, which occupy and use the same property thus given generally to the churches for the use of a particular church or of the whole church, would not be affected with any specific trust. Such property will be presumed to have been given with full knowledge that the church had power to change its name or specific statement of creed and unite with another church.

ID.—IDENTITY OF PROPERTY FOLLOWING UNION.—In case of a union of one Presbyterian Church with another upon agreed standards, the property of one of them follows the church so long as its identity can be established, and a general trust in relation thereto is not deemed to have been broken or perverted by such change regularly made.

ID.—DECISION BY HIGHEST CHURCH JUDICATORIES CONCLUSIVE UPON CIVIL COURTS.—Whenever questions of discipline or of faith or ecclesiastical rule, custom, or law have been decided by the highest church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final and as binding on them in their application to the case before them.

ID.—CONCLUSIVE DECISION AS TO HARMONIOUS CREEDS.—The decision of the Cumberland Church, that the creeds of the two churches were

sufficiently in agreement to warrant the proposed union, is final and conclusive as to the objection in court that the creeds are different.

ID.—CONCLUSIVE DECISION AS TO CONSTITUTIONALITY OF UNION—PROTEST OVERRULED.—The decision of the general assembly of the Cumberland Church as to the constitutionality of the union effected, notwithstanding the protest of a minority, which was fully considered and overruled by a constitutional two-thirds vote of the assembly, is final and conclusive upon the civil courts.

ID.—REGULARITY OF UNION A CONCLUDED QUESTION OF ECCLESIASTICAL LAW.—The regularity and validity of the union of the "Cumberland Presbyterian Church" with another "Presbyterian Church" of the same faith and form of government was essentially a question of ecclesiastical law, the decision of which puts the matter to rest so far as church members and all subordinate agencies are concerned; and the civil courts cannot overthrow the same on the ground of error in such decision.

ID.—REGULAR ACTION OF "PACIFIC SYNOD"—SCHISMATIC PLAINTIFF.— The union of the whole "Cumberland Presbyterian Church" with the "Presbyterian Church of the United States of America," under the name of the latter, having been lawfully effected, it is held that the action of the "Pacific Synod of the Cumberland Presbyterian Church," declaring that body to be the "Pacific Synod of the Presbyterian Church," etc., was regular and valid; that the trustees of the former synod who adhered to the latter did not vacate their offices; that the persons who separated from the former synod and organized the plaintiff body to perpetuate the existence of the former synod under the "Cumberland" name, were schismatics and had no authority to appoint trustees for the plaintiff synod, and the presbytery they assumed to appoint had no authority to maintain the action.

APPEAL from a judgment of the Superior Court of Santa Clara County and from an order denying a new trial.   M. H. Hyland, Judge.

The facts are stated in the opinion of the court.

T. E. Clark, H. L. Partridge, and W. C. Caldwell, for Appellant.

W. N. Rutherford, Beasly & Fry, and John M. Gaut, for Respondents.

SHAW. J.—The plaintiff has appealed from the judgment and from an order denying its motion for a new trial.

In the year 1882 the Pacific Synod of the Cumberland Presbyterian Church formed a corporation under the corporate name of "Permanent Committee of Missions of the Pacific Synod of the Cumberland Presbyterian Church in the United States." Its main purposes, as expressed in its articles, were to handle and disburse moneys contributed for the establishment and support of church organizations of that denomination within the synod boundaries, and to acquire and hold real and personal property in trust for the use of such church organizations. Its affairs were to be carried on by seven trustees to be elected by said Pacific Synod. It has acquired and now holds various parcels of real property in trust for the use of local congregations within the synod, and also considerable personal property.

The Presbyterian Church in the United States of America has been one of the leading churches in this country for over two centuries. Certain of its ministers, being dissatisfied with parts of its creed, formed the Cumberland Presbyterian Church in 1810. From that time until May 25, 1906, the two churches continued to exist separately. It is claimed th~' at the last-mentioned date they reunited as one church under the name of "Presbyterian Church in the United States of America." The validity of this alleged union is the question to be decided in this case. For convenience we will herein designate the original church the "Presbyterian Church" and the other as the "Cumberland Church." The controversy in this particular case turns upon the question which of two rival sets of seven persons each is the lawful board of trustees of the plaintiff corporation. The persons who, assuming to act as such trustees, begun this suit in its name, represent those opposed to said union, and who contend that no valid union has ever been effected. The defendants aver that certain seven persons, acting under the authority of the united church and in its behalf as trustees of the plaintiff, constitute the lawful board. Five of the seven trustees last mentioned were duly elected by the Pacific Synod of the Cumberland Presbyterian Church prior to the alleged union. Two of them have been chosen since that union by those of the former Cumberland Church who have been acting as a Pacific Synod of the united church. These seven are in control of the corporation and in custody of its property and records. At the session of said

Cumberland Synod of 1906, the union above referred to having
been, as it is claimed, then fully accomplished, a large majority
of the members of that Synod, after organizing, resolved to
recognize the union and, in accordance with the plan of union,
declared the body to be the "Pacific Synod of the Presbyterian
Church, U. S. A.," and proceeded to transact business as such.
Some thirteen of the persons present, only seven of whom were
members of said synod, refused to recognize such union as
valid or effectual, denied the authority of the majority to take
a new name or act at a part of the united church, withdrew
from the meeting and proceeded to organize and declare them-
selves to be the true "Pacific Synod of the Cumberland Pres-
byterian Church." This body assumed to decide that there
were six vacancies in the board of trustees of the plaintiff
corporation, one caused by change of residence and five by the
fact that five of the former trustees had remained with the
majority of the synod in organizing as a Pacific Synod of the
Presbyterian Church, U. S. A., which conduct this protesting
body construed to be a withdrawal from the Cumberland
Church, and as sufficient to disqualify them from further act-
ing as trustees. It proceeded to elect six persons to fill these
alleged vacancies. The other member they believed to be in
sympathy with them; in which, however, they were mistaken.
These six persons, purporting to act as a board of trustees,
have caused the present action to be begun in the name of said
corporation, to enjoin the defendants from interfering with
the use or control of any of said church property. The com-
plaint names as defendants said Pacific Synod of the Presby-
terian Church, U. S. A., the California Synod of the Presby-
terian Church, U. S. A., (a synod of the original Presbyterian
Church), and ten persons who, with others, it is alleged have
organized and now control said Pacific Synod last named. It
is averred that these ten persons, and others unknown,
intend to cause all the property belonging to the plaintiff cor-
poration as trustee, but now in control of said defendants, to
be delivered over to the trustees who remained with said Pacific
Synod last named, and the others afterwards elected, to be
used by and for the benefit of persons and local churches
affiliating with and adhering to said "California Synod of the
Presbyterian Church, U. S. A.," and not by or for the benefit
of congregations or members of the true Cumberland Presby-

terian Church. The court below held that the union of the two churches had been regularly effected, that the persons claiming to be trustees of plaintiff who acted with the said Pacific Synod of the Presbyterian Church, U. S. A., were rightfully in office as such trustees, and that the plaintiff had showed no injury.

The Cumberland Presbyterian Church was organized in 1810. Three ministers of the parent church were unable to believe in that part of the Westminster Confession which they understood to declare that the ultimate fate of all mankind was predetermined by Almighty God, some to free salvation after death, and others, whether dying in infancy or old age, to suffer eternal punishment because of the sin of Adam. These ministers organized their congregations into an independent presbytery, which called itself "Cumberland Presbytery." They expressly avowed a disbelief in the aforesaid fatalistic doctrines. It does not appear to have been the original design of these people to separate permanently from the Presbyterian Church, but rather to form some new relation whereby they could be allowed to retain their connection with that church, without conforming to or teaching the doctrines aforesaid. For a few years thereafter, unsuccessful efforts toward forming such a relation were made. In the mean time their numbers increased, new church societies were formed by them, and in 1813 a synod of three presbyteries was formed, the Westminster Confession, with the objectionable doctrines eliminated, was adopted as the system of doctrine, and a new and independent church was organized, which became known as the Cumberland Presbyterian Church. Other presbyteries and synods were added from time to time, and in 1829 a general assembly of these presbyteries met. From and after that time the Cumberland Church was a regularly organized religious society, having a form of government and rules in all substantial particulars the same as those of the Presbyterian Church from which it sprung, and with substantially the same faith and belief, except the fatalistic doctrines above mentioned. Congregations of this church were formed in California, and were organized into presbyteries which, in accordance with Presbyterian usage, constituted the "Pacific Synod" of that church. The Presbyterian Church was also extended into California, and its churches

were formed into presbyteries and a synod was organized by it called the "California Synod of the Presbyterian Church, U. S. A."

For many years there was, in the Presbyterian Church, dissatisfaction with the fatalistic doctrines above mentioned. In 1900 a movement to modify them was begun which, in 1903, culminated in an amendatory declaration of the belief of that church, in effect repudiating the offensive doctrines contained in the Westminster Confession, and declaring a belief in all substantial respects identical with that of the Cumberland Church. This change in the statement of the creed of the old church was immediately followed by overtures between the general assemblies of the two churches for reconciliation and organic union, with the result that the measures by which it is claimed the union in question was accomplished were taken and carried out.

The two churches had practically the same plan of organization and form of government. Each local congregation was called a "particular church." A presbytery embraced all of these "particular churches" within a prescribed district. The "particular churches" were immediately governed by a "church session," composed of the minister in charge and "ruling elders" elected for life, or for a fixed term, by the congregation. The powers of a presbytery were exercised by a body consisting of all the ordained ministers within its territorial limits and one ruling elder selected from each local church therein. The synod embraced at least three presbyteries and consisted of ministers and ruling elders from each local church. The general assembly was the highest authority of the church. It was a representative body composed of ministers and ruling elders selected by and from each of the presbyteries. In the Cumberland Presbyterian Church these representatives were called commissioners.

The Cumberland Church was originally formed as a single presbytery. In 1883, after that church had been in existence fully organized for many years, a written constitution was adopted, setting forth the form of government, rules of discipline, and the faith or creed of the church, and this constitution has ever since been recognized as the authorized and final statement in regard to all these matters. It was adopted in the manner then and always recognized by Presbyterians as

the lawful and authorized method of fixing the form of government, rules, and creed of the whole church; that is, by a formulation thereof by the general assembly, by an adoption thereof by that body, and by the subsequent submission to and approval thereof by a majority of all the presbyteries of which the church was then composed.

This constitution stated that the powers of the church were exercised by bodies or "courts," called respectively, church sessions, presbyteries, synods, and the general assembly. It declared that "the general assembly is the highest court of this church, and represents in one body all the particular churches thereof." Its title or name was the "general assembly of the Cumberland Presbyterian Church," and it was constituted the "bond of union, peace, correspondence and mutual confidence among all its churches and courts." It was to have jurisdiction "over such matters as concern the whole church," but limited by the express provisions of the constitution. It had power to "decide in all controversies respecting doctrine and discipline; to concert measures for promoting the prosperity and enlargement of the church; to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrine and order of this church," and to supervise, control, amend, or annul the action of any of the subordinate bodies. The word "court" is used in this constitution, not in the restricted sense of a tribunal exercising judicial powers alone, but in the more comprehensive sense of a body possessing all the governmental powers, legislative, executive, and judicial.

With respect to changes and amendments of the constitution it provided as follows:—

"Upon the recommendation of the general assembly, at a stated meeting, by a two thirds vote of the members thereof voting thereon, the confession of faith, catechism, constitution and the rules of discipline, may be amended or changed when a majority of the presbyteries, upon the same being transmitted for their action, shall approve thereof.

"The other parts of the government—that is to say, the general regulations, the directory for worship, and the rules of order—may be amended or changed at any meeting of the general assembly by a vote of two thirds of the entire number of commissioners enrolled at that meeting, provided that such

amendment or change shall not conflict, in letter or spirit, with the confession of faith, catechism, or constitution."

In May, 1903, the general assemblies of the two churches being in session, each appointed a committee on fraternity and union, to act jointly with the committee of the other assembly in formulating and reporting a plan of union between the two churches. These committees, in joint session, prepared a written statement of the plan of union, which was reported to the general assembly of each church in May, 1904, and was then regularly adopted by each general assembly by a majority far exceeding the two thirds required by the Cumberland Church constitution. The material parts of this plan of union are as follows:—

"That the reunion of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church be accomplished as soon as the necessary steps can be taken, upon the basis hereinafter set forth.

"1. The Presbyterian Church in the United States of America, whose general assembly met in the Immanuel Church, Los Angeles, Cal., May 21st, 1903, and the Cumberland Presbyterian Church, whose general assembly met in the First Cumberland Presbyterian Church, Nashville, Tenn., May 21st, 1903, shall be united as one church, under the name and style of The Presbyterian Church in the United States of America, possessing all the legal and corporate rights and powers which the separate churches now possess.

"2. The union shall be effected on the doctrinal basis of the confession of faith of the Presbyterian Church in the United States of America, as revised in 1903, and of its other doctrinal and ecclesiastical standards; and the scriptures of the Old and New Testaments shall be acknowledged as the inspired word of God, the only infallible rule of faith and practice.

"3. Each of the assemblies shall submit the foregoing basis of union to its presbyteries, which shall be required to meet on or before April 30th, 1905, to express their approval or disapproval of the same by a categorical answer to this question:

" 'Do you approve of the reunion and union of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church on the following basis: The union shall be effected on the doctrinal basis of the confession

of faith of the Presbyterian Church in the United States of America, as revised in 1903, and of its other doctrinal and ecclesiastical standards; and the scriptures of the Old and New Testaments shall be acknowledged as the inspired word of God, the only infallible rule of faith and practice?'

"Each presbytery shall, before the tenth day of May, 1905, forward to the stated clerk of the assembly with which it is connected, a statement of its vote on the said basis of union.

"4. The report of the vote of the presbyteries shall be submitted by the respective stated clerks to the general assemblies meeting in 1905, and if the general assemblies shall then find and declare that the foregoing basis of union has been approved by the constitutional majority of the presbyteries connected with each branch of the church, then the same shall be of binding force, and both assemblies shall take action accordingly. . . .

"2. The foregoing basis of union and eight concurrent declarations shall be submitted to the respective general assemblies of 1904, and the above recommendation, numbered 1, shall be submitted to the general assembly of the Presbyterian Church in the United States of America, meeting in 1904; and this entire plan of union shall be operative when said basis of union, concurrent declarations and recommendation numbered 1, shall have been adopted in their entirety, and where necessary by presbyterial action."

The plan also contained certain "concurrent declarations," providing for the adjustment of details as to the standing, after the union, of the respective synods and presbyteries and other subordinate bodies of the two churches, together with other matters of detail not necessary here to mention. The "concurrent declarations" and "recommendation numbered 1," mentioned in the last paragraph (numbered 2) quoted above, referred to certain action to be taken by the general assemblies alone, which was duly taken, and which is not essential to the existence or exercise of the power to unite.

The basis of union was, in the manner specified therein, regularly submitted to the presbyteries of the Cumberland Church by the proper officers of its general assembly, and was approved by a majority of them. Prior to May 10, 1905, the presbyteries made returns of their action in the matter to the stated clerk of the assembly. The returns were reported to the

general assembly of that church which met in May, 1905. They were duly canvassed by that body and it was ascertained and declared that a majority of the presbyteries had approved the proposed union. Said assembly thereupon formally declared that the said basis of union had been constitutionally adopted.

The basis of union was also adopted by the general assembly and presbyteries of the Presbyterian Church, in the same manner and in the same year.

At the general assembly of each church held in May, 1905, the matter of the union was passed without final action, to be taken up again by the respective general assemblies in 1906. In May, 1906, the two general assemblies again met in regular session. Each communicated to the other the fact of the adoption of the basis of union. The general assembly of the Cumberland Church thereupon declared that the union was in operation and effect, that the effect thereof was that the former Cumberland Presbyterian Church had adopted the confession of faith of the "Presbyterian Church in the United States of America," as revised in 1903, and also the other "doctrinal and ecclesiastical standards" of that church, and that the same were effective and operative upon all ministers, elders, deacons, officers, particular churches, judicatories, boards, committees, and all other ecclesiastical organizations, institutions, and agencies of the Cumberland Presbyterian Church, that the succeeding general assembly of the Presbyterian Church, which was to meet on the third Thursday of May, 1907, should be composed of representatives from all the presbyteries of the reunited church, and that all presbyteries formerly of the Cumberland Church should elect representatives to said united general assembly of 1907 of the Presbyterian Church. This declaration was made by the general assembly of the Cumberland Church after a protest against the same had been made by a considerable minority of the members of the general assembly, which protest included the main grounds upon which the union is now attacked. The protest was overruled and the general assembly then adjourned *sine die* as a separate general assembly. Similar action in regard to the union was taken by the assembly of the Presbyterian Church in the United States of America. It is not contended that the action of that church in the accomplishment

of the union in controversy was not in all respects valid and binding, so far as that church and its members were concerned. The plaintiff's attack is confined to the proceedings taken on behalf of the Cumberland Church.

The evidence shows that in California the union was approved or acquiesced in by almost the entire membership of the Cumberland Church, and that the local congregations, or "particular churches," instituted by that church are now avowedly affiliating with the united church and using the respective church properties as part of that church.

It is claimed that the action by which the proposed union was attempted was wholly void and ineffectual so far as the Cumberland Church is concerned, that those of its members, elders, and ministers who have affiliated with and assumed to be members of a united or combined church are, in law and in fact, seceders and outsiders, without any authority, right, or power to act for the Cumberland Church, or to use or control the property belonging to that church at the time the so-called union took place, and that the Cumberland Church remains, as before, a separate church organization with all of its subordinate bodies intact, including those of its officers and members who repudiate the alleged union. This claim is based on two principal grounds: 1. That the basis of union, as an entirety, was not submitted to the presbyteries; and 2. That the general assembly and the presbyteries did not have the power to effect such union.

The first ground, specifically, is that the question proposed to the presbyteries and affirmatively answered, did not include that part of the proposition stated in the first paragraph of the basis of union providing that the united church should have the "name and style of The Presbyterian Church in the United States of America," that the presbyteries have never expressly approved of the proposal so far as it involved the elimination of the word "Cumberland" from the church name, and hence that the attempt to unite was abortive. In this connection we will also notice the objection that neither the assembly alone, nor the assembly and presbyteries together, had the power to change the name of the church.

We do not find anywhere in the Cumberland Presbyterian constitution a declaration that the name of the church shall be the "Cumberland Presbyterian Church." The history of that

church does not show that by any action of the membership, or of the general assembly and presbyteries jointly, that name was adopted as the name of the church. The first presbytery, which was organized in 1810, adopted the name, "Cumberland Presbytery." In the subsequent meetings of the church courts, and in the church literature, the church was always designated as the Cumberland Presbyterian Church. The constitution of 1883 describes the church by that name and further declares that the general assembly "bears the title of the general assembly of the Cumberland Presbyterian Church." In the year 1850, a change of name was suggested in the general assembly, but it did not meet with favor, and the proposition was dropped without action. There is nothing in the evidence to show that the church, either by general assembly action, or by that body and the presbyteries combined, has ever expressly declared what its name should be. It evidently received its name originally by common consent from the fact that its first presbytery took the distinctive name "Cumberland" because it was located in the Cumberland region of Tennessee. The name, therefore, is not shown to be an essential part of the church structure. It constitutes no part of the church government. A change of name would seem to be within the province of the general assembly, acting alone. It has general jurisdiction "over such matters as concern the whole church." It was expressly authorized "to concert measures for promoting the prosperity and enlargement of the church" and to superintend the affairs of the whole church. It is made the supreme authority of the church; except as "limited by the express provisions of the constitution." The provision that the assembly, with the approval of the presbyteries, may change or amend the confession of faith, the catechism, the constitution, and the rules of discipline, is perhaps a limitation upon the power of the assembly alone to make such changes or amendments. But this provision does not include the change of the church name. Nor is the name a part of the general regulations, directory for worship, or rules of order, which, by the second paragraph of the provision concerning amendments, can be amended or changed only by a two-thirds vote of all the enrolled members of the assembly. As observed in *McBride* v. *Porter,* 17 Iowa, 204, "It is the substance and not the name, that the law regards." Not being

expressly fixed by the constitution, the church name is not an essential part of it. The obvious conclusion is that it is within the power of the assembly to change the name, and there was no necessity for the approval thereof by the presbyteries. In confirmation of this conclusion we have the decision of the general assembly, itself. Its formal declaration that the entire plan of union had been constitutionally adopted, could be true, with respect to the change of name, only upon the theory that the question put to and affirmed by the presbyteries included an approval of the proposed change of name, or upon the theory that presbyterial approval thereof was not necessary. The declaration was therefore equivalent to a decision that one of these two theories was correct. This being a matter solely of ecclesiastical jurisprudence, the decision of the assembly, the highest authority of the church, is, as we will hereinafter show, conclusive upon all civil courts.

Moreover, the terms of the question, if the appellant's counsel are correct in their estimate of the importance of the name, imply the change of name. The Cumberland Church was formed by members of the Presbyterian Church. The question proposed the "reunion and union" of the two churches, obviously meaning the reunion which had been proposed in the basis of union, including the change of name. It stated that the change was to be made upon the "ecclesiastical standards" of the Presbyterian Church. If the name was so all-important as the appellant insists that it was, so important that its omission would have been fatal to the union, then its name must have constituted one of the "standards" of the Presbyterian Church, and a reunion under those standards would have been a reunion under its name.

But if we are wrong in these propositions, it by no means follows that the mere name by which the two churches were to be known, after the union, was of such vital importance to the plan of union and to its operation and effect, that the attempt to unite, although complete in all other particulars, would be ineffective if the name of the united church was not prescribed or fixed as a part of the plan, or if, although specified in the original plan, it was for any reason not included in the plan as adopted. The two churches could have united without changing the name of either and without any provision fixing the name of the new and united church, and such union would

have been entirely valid and effectual. The name of the united church in that event would have been matter for further consideration by the united church, and it could have been determined in the proper and lawful manner by the lawfully authorized bodies of the new church. If the new name has not been properly submitted to the presbyteries, and such submission is necessary, then a name can now be adopted by the general assembly and presbyteries of the united church. We are of the opinion that the omission of the specification of the name, in the question to be answered by the presbyteries, is not destructive of the union formed by the action of the assembly and presbyteries.

There was not, in fact, any fraud, deception, or concealment in the failure to include the proposed name in the question. The proposed union was first suggested in the year 1900. The two committees to frame a plan of union were appointed in 1903. The plan was adopted in 1904. It was submitted to the presbyteries during the interval between May, 1904, and May 10, 1905. During all this time, in all its stages, the union was hotly opposed by an earnest and active minority of considerable numbers. The entire plan proposed was thoroughly debated by the entire church during this interval. In transmitting the question to the presbyteries, the circular letter accompanying it and presumably authorized by the assembly, informed them that "your action thereon will mean the acceptance or rejection of the entire plan, embracing the 'basis of union,' 'concurrent declarations,' and 'recommendations.'" There was no lack of understanding that the church name was to be that of the old church, if the reunion took place.

We are unable to discover in the proceedings for reunion any substantial departure from the established mode of procedure as established by immemorially recognized Presbyterian usage and as prescribed by the constitution of the Cumberland Presbyterian Church, itself.

Nor do we perceive any lack of power to accomplish the reunion in the manner in which the church authorities acted in the matter. The constitution provides that the confession of faith, catechism, constitution, and rules of discipline "may be amended or changed" by the co-operative action of two thirds of the members of the general assembly voting thereon and of a majority of the presbyteries, precisely in the manner here

followed. The constitution and rules of discipline constitute substantially all there is in the idea of church government and organization. The power to change these includes the power to adopt an entirely new constitution, rules of discipline, or form of government for the church, as well as to change any other of its established institutions or features.

It is said that the attempt to unite was ineffectual because no vote of the individual members of the church was taken and because it does not appear that they, or a majority of them, ever consented to such union. The argument is that the sovereign power of the church rests in the members and that, although they may have committed to the presbyteries and the assembly power to change matters of procedure and form, or the internal organization of the church, yet they have not given power to these bodies to adopt measures so radical as the union of the church, as a body, including members and temporalities, with another church, involving as it does in this case the complete effacement of the church individuality, the destruction of its separate existence and the taking of a name hitherto recognized as descriptive of a distinct and different church organization composed of different members.

It is obvious that no formal vote of the members was necessary to the exercise of the powers actually conferred upon the assembly and presbyteries, none being prescribed by the constitution. When a person joins an organized society, such as a church or congregation associated for religious worship, under the supervision and control of higher church courts, he necessarily by that act agrees to abide by its rules of government and the judgments of its courts regularly made, and consents that all his rights, privileges and duties as a member, or in respect to his membership, shall be governed and controlled by those rules and judgments. This agreement is always implied from the fact of membership. (*Watson* v. *Jones*, 80 U. S. 729; *Lamb* v. *Cain*, 129 Ind. 513, [29 N. E. 13]; *White Lick etc.* v. *White Lick etc.*, 89 Ind. 151; *Bear* v. *Heasley*, 98 Mich. 289, [57 N. W. 270]; *McGinnis* v. *Watson*, 41 Pa. St. 14; *Mack* v. *Kime*, 129 Ga. 17, [58 S. E. 184]; 24 Am. & Eng. Ency. of Law, 338.) In the Cumberland Church an express promise was exacted of persons uniting therewith "to abide by and support the rules and regulations" of the church,

while a member thereof.   According to Presbyterian polity, as
established from time immemorial, the only acts of sovereignty,
if they can be called such, retained by, or permitted to, the
individual members, with respect to such matters as are here
involved, are the election of deacons and ruling elders when
a particular church is organized and when vacancies occur,
and the selection of a ruling elder as a representative of the
particular church in the presbytery and synod.   This limita-
tion upon the rights of members is also apparent from the
terms of the Cumberland constitution of 1883.   These powers
are expressly mentioned therein as pertaining to the mem-
bers, and there is nothing anywhere in it evincing any intent to
depart from or change the previous church usage and polity
in this particular.   All other powers of a sovereign character
are vested in the presbyteries and general assembly.   The
powers thus vested are, when exercised, binding upon all the
members whether the result is satisfactory to them or not.   If
a member is not willing to submit, he may withdraw from the
church and cease to be a member, but while retaining member-
ship, he must yield to the decrees of the church authorities
made in the recognized and established mode.   The members
are therefore bound by and carried into this union, with all
its consequences, unless the power to make it has been withheld
from the assembly and presbyteries, which are admittedly
vested with all other sovereign ecclesiastical authorities.

It is contended that this power is inherent in the member-
ship, and that it is so important in its nature and consequences
that nothing less than an express declaration in the constitu-
tion can be received as evidence that it has been delegated to
representatives, or to the constituted authorities of the church.
We are aware of no right or privilege, civil or ecclesiastical,
which may be abnegated at all, which is so sacred that power
to yield or part with it cannot be delegated otherwise than by
express declaration, except when protected by some statute or
constitution, as, for instance, the statute of frauds.   Human
intentions and desires are manifested in various ways, and the
manifestation may be equally authoritative and binding when
evidenced by conduct as when shown by express statement.
The evidence shows that in Presbyterian usage from its be-
ginning all church power has been uniformly and universally
considered and understood to be vested in the presbyteries and

assembly.    (See *Fussell* v. *Hail*, 134 Ill. App. 634.)    The
presbytery is the recognized church unit and has a voice in
affairs of this character.    The assembly consists of representa-
tives of the several presbyteries and, as the Cumberland con-
stitution states, it is the "bond of union" between them and
"represents in one body all the particular churches."    It de-
clares and executes, for the whole church, the orders and judg-
ments of the presbyteries expressed through their representa-
tives assembled in and constituting the assembly.    The highest
governmental powers were always exercised and declared by
their joint action in this manner, before any written constitu-
tion had purported to confer the authority upon them to do so.
A striking example of this is found in the history of the Cum-
berland Church itself, in the adoption, by its assembly and
presbyteries, of the church constitution in 1883.    No vote of
the members or church sessions was taken to accomplish this
act.    Nor was it ever considered or claimed that such vote was
necessary to its validity and force.    If those bodies could thus,
in the absence of any express authority, determine the form of
church government, the statement of its doctrine, the rights
and privileges of its members, and the powers and duties of
its several bodies and courts, it is clear that they must have
power to do so now, since that constitution expressly confers it
upon them.    There is no limitation with regard to the particu-
lar form or mode of exercising this power.    A formal or
avowed amendment to the constitution is not made a measure
of the power.    It may be made in any reasonable way, and
hence it may be done by a resolution declaring that henceforth
the rights, privileges, and powers of the members, ministers,
courts, and subordinate bodies shall be enjoyed, not separately
as before, but in unison and conjunction with another church
of similar faith and form of government, but having a differ-
ent name.    (*McGinnis* v. *Watson*, 41 Pa. St. 25; *Brundage* v.
*Deardorff*, 92 Fed. 225.)    We are satisfied that a vote of the
members was not necessary to the exercise of this power by the
general assembly and presbyteries.

Although the members may not have given a formal assent
to such changes, nor voted directly upon them, it does not
follow that they have had no voice in regard thereto.    The
Presbyterian government is wholly representative in character.
It has no characteristics of a pure democracy.    The members

exercise their will in such affairs, so far as they may under the Presbyterian system, in choosing the ruling elders, in selecting one of them as a representative to the presbytery and in exerting their personal influence upon the ministers and ruling elders, by which means they doubtless frequently secure their desires. This government by representatives, being the recognized rule of the church to which the members consented when they joined, it cannot be said that there has been any violation of the compact between the church and its members, or anything unfair, in the method of effecting the union.

The conclusion which we have reached on this branch of the case makes immaterial the objection that the result of the action of the church, if effectual, would not be a mere union of the two societies, but would be a merger of the Cumberland Church into the Presbyterian Church, or an absorption of the former by the latter, which, it is said, is equivalent to a complete destruction or annihilation of the former. Granting that such would be the technical effect of the proceedings, the power to change and amend is unlimited, and it was within the power of the assembly and presbyteries to carry it to that extent. But as it may be of some importance in construing the judgment in this case, we deem it necessary to say that in our opinion no such consequences ensue. Each particular church, each presbytery and each synod, established by the Cumberland Church, retains its individual and separate integrity and existence and its property rights, after the union as fully as before, until and unless some change is made by the regular authorities of the united church having power to make it. The main difference in their condition resulting from the union, is that they now belong to a larger body and have relatively less influence and power in affairs affecting the whole church. The entire church continues to exist, not separately and distinctively, indeed, but in union and association with the other church. The same is true of the Presbyterian Church. The united church exists in continuity with, and as the successor of, both of the former churches. Neither of them has now a separate existence, one no more than the other. (*McGinnis* v. *Watson*, 41 Pa. St. 28; *Gibson* v. *Armstrong*, 46 Ky. 507; *Central University* v. *Walters' Exrs.*, 122 Ky. 79, [90 S. W. 1066]; *McBride* v. *Porter*, 17 Iowa, 204.)

A further objection is made that the basis of union adopted and carried out does not purport to be an amendment of the constitution of the Cumberland Presbyterian Church, that the uniting of that church with another church is, in no sense an amendment of that constitution and hence that the power to do it is not given to the assembly and presbyteries, and that as the power of amendment is manifestly a granted power, the mode prescribed must be followed. We are of the opinion that these objections require a construction of the powers of the church authorities, and of the terms of the declaration by which the union was accomplished, entirely too narrow and technical. That the terms of the basis of union are very general is conceded. An amendment or change may be as well made by a new enactment, not mentioning or referring to the one which it supersedes, as by a declaration which expressly purports to amend or change the formerly existing law or constitution. And the intention of the legislative authority is shown as clearly by the brief statement that the confession of faith and other doctrinal and ecclesiastical standards of the Presbyterian Church shall henceforth be those of the united church, as by the most elaborate and detailed statement. The effect of the declaration contained in the basis of union is clear, although the words are few. The doctrine, form of government, everything pertaining to the old church that is included in the comprehensive phrase "ecclesiastical standards" are by that declaration made the doctrines, form of government, and standards of the Cumberland Presbyterian Church, and the two become one. Whether the process is called an amendment of the old constitution, or the formation or adoption of a new one, which, in effect, would be a "change," the intent is clearly manifested and the church authorities concerned had the power to proceed as they did. The power to form a union is included in the absolute sovereign power vested in these church courts by Presbyterian usage, and declared by the constitution itself, a power which, as we have seen, was pre-existent to that constitution.

It is said that the property in the hands of the plaintiff corporation consists of donations made to the authorities of the Cumberland Presbyterian Church, in their capacity as such, for the purpose of aiding and supporting that church and its various institutions, that it is held in trust by that corporation

for those purposes, and that it would be a violation of the trust and a perversion of the funds and properties to appropriate it to the use of the united church, which, counsel insist, is a different and distinct denomination. Several answers may be made to this proposition. We have shown that the identity of the Cumberland Church and its respective synods, presbyteries, church sessions, particular churches, and other church institutions, including the plaintiff corporation, is not lost, but continues under the name of the united church and in connection therewith. Hence the united church is not a different or distinct denomination. There is no evidence that any part of the fund or property was given upon the specific trust that it was to be held by the church so long only as it retained the word "Cumberland," as a part of its distinctive name, or for the purpose of aiding in the teaching of the exact creed, or statement thereof, found in the Cumberland constitution at the time of such donation. If any property was so given and is so held, the right of the donors, or beneficiaries, to enforce the trust would not be affected by the decision and judgment in this case, since no such issue is raised and such persons are not parties to the suit. The finding of the court below is that the property consists of houses of worship held by the plaintiff corporation for the members of the local churches, respectively, which occupy and use the same. Property thus given generally to the church authorities for the use of a particular church, or of the whole church, would not be affected with such specific trusts as are here contended for. Such property will be presumed to have been given with full knowledge that the church had power to change its name or creed and unite with another church. In such cases the property follows the church so long as its identity can be established, and the trust is not deemed to have been broken or perverted by such change, regularly made. (*Watson* v. *Jones*, 80 U. S. 726; *Horsman* v. *Allen*, 129 Cal. 136, [61 Pac. 796]; *McGinnis* v. *Watson*, 41 Pa. St. 16; *Gibson* v. *Armstrong*, 46 Ky. 500; *Mack* v. *Kime*, 129 Ga. 24, [58 S. E. 184]; *Brown* v. *Clark*, 102 Tex. 323, [116 S. W. 364]; *Wallace* v. *Hughes*, (Ky.) 115 S. W. 691.)

We have preferred to decide the case on a consideration of the provisions of the constitution of the Cumberland Church, the powers of its judicatories, and the manner of the attempted

exercise of those powers, without regard to the decisions of the general assembly of that church upon these questions. We have supposed that this would be more satisfactory to the parties concerned. Lest we be understood to hold that the civil courts can disregard and overrule the decisions of the church authorities, acting regularly, in ecclesiastical matters, we expressly disavow that doctrine. We approve the principle laid down by the supreme court of the United States in *Watson* v. *Jones,* 80 U. S. 726, and by the supreme court of this state in *Horsman* v. *Allen,* 129 Cal. 136, [61 Pac. 796], relating to this subject. "Whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of the church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." (*Watson* v. *Jones,* 80 U. S. 727.) This was said with reference to the Presbyterian Church, and it is declared to be the doctrine applicable to all churches having a similar system of ecclesiastical government. The doctrine has been followed in many other cases and, although not accepted in England, it is the prevailing rule in this country. (*Brown* v. *Clark,* 102 Tex. 323, [116 S. W. 364]; *Mack* v. *Kime,* 129 Ga. 24, [58 S. E. 184]; *Fussell* v. *Hail,* 134 Ill. App. 634; *Wallace* v. *Hughes,* (Ky.) 115 S. W. 691; *Brundage* v. *Deardorff,* 92 Fed. 225; *Trustees* v. *Harris,* 73 Conn. 217, [47 Atl. 116]; *Lamb* v. *Cain,* 129 Ind. 518, [29 N. E. 13]; *Kuns* v. *Robertson,* 154 Ill. 413, [40 N. E. 343]; *Chase* v. *Cheney,* 58 Ill. 509; *Russie* v. *Brazzell,* 128 Mo. 112, [49 Am. St. Rep. 542, 30 S. W. 526]; *Wheelock* v. *First Presbyterian Church,* 119 Cal. 482, [51 Pac. 841]; *Gibson* v. *Armstrong,* 46 Ky. 500.)

If this rule were followed, the decision of the general assembly of the Cumberland Church that the creeds of the two churches were sufficiently in agreement to warrant the proposed union, is final as to the objection that the creeds are different. The authorities would also support the proposition that the decision of that general assembly, to the effect that the union of the two churches was constitutionally made and had become operative, is final and conclusive upon the civil courts. That decision was made after a protest had been regularly presented to that body, attacking the validity of the

union on the same grounds which we have here considered, due deliberation was had thereon, and the final decision was in all respects regular. The regularity and validity of the union of that church with another of the same faith and form of government was essentially a question of ecclesiastical law. In view of its expressly conferred powers, as hereinbefore recited, it would seem that this decision of the general assembly should put the matter at rest, so far as the church members, and its subordinate agencies are concerned, even if we were of the opinion that the decision was erroneous.

The effect of these conclusions, as applied to the case at bar, is that the several synods, presbyteries, church sessions, and subordinate instruments and agencies of the former Cumberland Church, are bound by the action of the assembly and presbyteries aforesaid; that they are now connected only with the united church, under the name of the Presbyterian Church in the United States of America; that the action of the majority of the Pacific Synod of the Cumberland Church, in 1906, declaring that body to be the Pacific Synod of the Presbyterian Church in the United States of America, was regular and valid; that the trustees of the plaintiff who adhered to said Pacific Synod did not thereby vacate their offices as trustees; that the persons who separated from said meeting of said synod and organized to perpetuate the separate existence of the Cumberland Church, were schismatics, and had and have no authority to appoint trustees for the plaintiff corporation, and that the persons they assumed to appoint as such trustees had no authority to bring or maintain this action. The conclusions of the court below to this effect were correct.

It is proper to add that the validity and effect of this union has heretofore been considered by the higher courts of other states. The courts of Illinois, Georgia, Kentucky, and Texas reached the same conclusion which we have here announced, in *Fussell* v. *Hail*, 134 Ill. App. 634; *Mack* v. *Kime*, 129 Ga. 24, [58 S. E, 184; *Wallace* v. *Hughes*, (Ky.) 115 S. W. 691, and *Brown* v. *Clark*, 102 Tex. 323, [116 S. W. 364]. In *Boyle* v. *Roberts*, 222 Mo. 613, [121 S. W. 805], and *Landreth* v. *Hudgins*, (Tenn.) 120 S. W. 783, decided in November, 1907, the supreme courts of Missouri and Tennessee, respectively, held that the union was invalid. We are in accord with the decisions in the states first mentioned.

CLVII Cal.—9

The judgment and order are affirmed.

Angellotti, J., Sloss, J., Melvin, J., Henshaw, J., and Lorigan, J., concurred.

Rehearing denied.