[Civ. No. 8063. First Appellate District, Division Two.—January 23, 1932.]

THE FIRST ENGLISH EVANGELICAL LUTHERAN CHURCH OF LOS ANGELES (a Corporation) et al., Appellants, v. REV. WILLIAM S. DYSINGER et al., Respondents.

Holcomb & Holcomb and Clarence B. Runkle for Appellants.

Schweitzer & Hutton, Salisbury & Robinson and B. R. Ware for Respondents.

STURTEVANT, J.—From a judgment in favor of the defendants determining conflicting claims to the church property the plaintiffs have appealed.

The First English Evangelical Lutheran Church of Los Angeles, hereinafter called the church, was organized many years ago. In 1887 it was incorporated. In the following year it bought land and commenced to build thereon a church building and to furnish it. That is the property that is the subject of this action. It was stipulated that the property was paid for, in part, out of a donation received from the Board of Missions of the English Evangelical Church and in part by contributions from members of the church. It is not claimed that the property was conveyed in trust. In 1895 the Evangelical Lutheran Synod of California was organized. Its members include the plaintiff church, other churches in this state, and also many pastors. As early as 1869 the General Synod was organized and since then it has consolidated with other general synods and since 1916 has been called United Lutheran Church of America. The General Synod is composed of district synods one of which is the Evangelical Lutheran Synod of California. The church, the California Synod, and the General Synod each have separate constitutions. In appropriate places we will refer to passages in those instruments, but it is not necessary at this time to go into detail as to the contents of each document. For many years Rev. William S. Dysinger was the pastor of the plaintiff church. In 1925 some controversy arose about his work. He was charged with certain acts of insubordination. Charges were filed, a trial was had, and the decision of the District Synod was against him. By the terms of that decision he was asked to resign within a given time or his appointment would be terminated as of a certain date. That judgment has become final. But before the date of the termination of his pastorate arrived many purported changes were attempted.

A notice was given of a meeting at which certain amendments of the ·constitution of the church would be tendered. Prior to September 22, 1926, among other things the constitution contained the following passages without deletion or interlineation:

"Art. II    Doctrinal Position

"Sec. 1. This church in accordance with the doctrinal position of the General Synod, of the Evangelical Lutheran Church in United States, and in the words thereof, receives and holds the canonical scriptures of the old and new Testaments as the Word of God, and the only infallible rule of faith and practice, and it receives and holds the unaltered Augsburg Confession as a correct exhibition of the faith and doctrine of our church as founded upon that Word, adopts for its government and discipline the formula of government and discipline of the General Synod of Evangelical Lutheran Church in the United States, ~~and it shall always be connected with a district synod of the General Synod of the Evangelical Lutheran Church in the United States.~~

"Art. IV    The Pastor

may

"Sec. 1.    The pastor of this church ~~shall~~ be a member of the Evangelical Lutheran Synod in connection with the General Synod, within whose bounds this church is located, ~~and with which this church itself is connected.~~

"Art. XII    Amendments

"Sec. 1. No alterations or amendments to this constitution shall be made unless recommended by at least three members of the church council or fifteen members of the church who are electors; then approved by two thirds of the voters of the church present at a meeting, lawfully called after at least one month's notice of the amendment proposed, ~~but no alteration or amendment of Article II, or Article IV, Sec. 1, or Article XII, Sec. 1, shall ever be made, so long as one member of the church is opposed to such alteration or amendment.~~"

On the date last mentioned purported amendments were adopted attempting to make the changes indicated.    No single vote was unanimous.    There was a substantial negative on each vote.    Claiming to rely on the said purported amendments, the defendants since September 22, 1926, have

claimed to be a congregation sole not attached to any Synod and not under the government or control of any Synod. The majority of the members, the former officials, and the pastor are holding, and claiming to hold, the church property of right as against the minority and the governing synods, both district and general. The minority members have not been excluded, but have been permitted to attend the church as reorganized or to go hence. After the purported amendments were adopted, they were never submitted to the president of the California Synod for his approval, notwithstanding that the constitution of that Synod contains a section in part as follows:

"A congregation desiring admission to the Synod shall place in the hands of the president a formal application signed by the secretary of the Church Council and by the pastor, . . . it shall submit a copy of its Constitution and of its Charter, if incorporated. If the executive committee finds these in accord with the requirements of the Constitution of the Synod, the congregation may be received into membership by a majority vote of the Synod at any meeting. *Contemplated changes of its Constitution, affecting* the articles of faith, *adherence to the Synod and the United Lutheran Church in America and disposition of its property shall be reported to the president of the Synod for his approval.*"

A number of the minority members protested, but their protest was not heeded. They appealed to the California Synod and that body rendered a decree in their favor. The decree was not obeyed by the defendants. The minority members elected the plaintiffs as the trustees of the church and, as the trustees, they commenced this action.

The preamble of the constitution of the General Synod is a full statement of the doctrine of the Evangelical Lutherans. That statement is repeated in substance in the constitution of the District Synod. It is again repeated in the constitution of the plaintiff. A document, "Formula for the Government and Discipline of the Evangelical Lutheran Church", adopted by the General Synod, revised in 1888, is referred to in plaintiff's articles of incorporation and in its constitution. It is a detailed statement of the purposes and meanings of the provisions of the constitution. From these documents it is apparent that the individual is

to be allowed the utmost liberty, but that the doctrines of the church are to be preserved; that, unto that end, the church is governed by three judicatories; the Council of each individual church, the District Synod, and the General Synod. One of the powers of the District Synod is to ordain ministers, to suspend and depose them for cause after a trial duly had, and to exercise other powers of discipline. Before any church can become a member of the District Synod it must submit its constitution for approval. Relying on these facts, the plaintiffs claim to be the true representatives of the church and to be entitled to the custody of the church property.

In the leading case entitled *Watson* v. *Jones,* 13 Wall. (U. S.) 679, at page 722 [20 L. Ed. 666], Mr. Justice Miller writing the opinion, said:

"The questions which have come before the civil courts concerning the rights to property held by ecclesiastical bodies, may, so far as we have been able to examine them, be profitably classified under three general heads, which of course do not include cases governed by considerations applicable to a church established and supported by law as the religion of the state.

"1. The first of these is when the property which is the subject of controversy has been, by the deed or will of the donor, or other instrument by which the property is held, by the express terms of the instrument devoted to the teaching, support, or spread of some specific form of religious doctrine or belief.

"2. The second is when the property is held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority.

"3. The third is where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization."

Then on page 726 of *Watson* v. *Jones, supra,* speaking of the third class above mentioned, Mr. Justice Miller said:

"Here is no case of property devoted forever by the instrument which conveyed it, or by any specific declaration of its owner, to the support of any special religious dogmas, or any peculiar form of worship, but of property purchased for the use of a religious congregation, and so long as any existing religious congregation can be ascertained to be that congregation, or its regular and legitimate successor, it is entitled to the use of the property. In the case of an independent congregation we have pointed out how this identity, or succession, is to be ascertained, but in cases of this character we are bound to look at the fact *that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments."* (Italics ours.) That case has frequently been cited and followed. (*Permanent Committee of Missions* v. *Pacific Synod,* 157 Cal. 105, 128 [106 Pac. 395].) ██ As we have shown above the District Synod has decided the controversy in favor of the plaintiffs in this case. It follows that the judgment of the trial court should have been for the plaintiffs. ██ But the defendants assert that before the District Synod rendered its decision the defendants amended their constitution and withdrew. The point is not well taken for several reasons. To pass each amendment required a unanimous vote. It was not had on any one of the amendments. The first, second and third amendments as printed above needed the approval of the president of the synod. That approval was not had. Furthermore, the amendments, if regular, operated to change a synod form of organization into a congregational form. That may not be done by the church amending its constitution. Similar acts were attempted on other occasions. In *Borgman* v. *Bultema,* 213 Mich. 684 [182 N. W. 91], the Supreme Court of Michigan was considering the point. At page 96, Mr. Justice Clark, speaking for the court, said: "The amendment attempted is void. It is an effort to set up in this church of presbyterial form of government a congregational form of government. What was said in *Fuchs* v. *Meisel,* 102 Mich. 357 [32 L. R. A. 92, 60 N. W. 773], is applicable: 'In the freedom of conscience and the right to worship allowed in this country, the defendants and the members of this church undoubtedly possessed the right to withdraw

from it, with or without reason. But they could not take with them, for their own purposes, or transfer to any other religious body, the property dedicated to and conveyed for the worship of God under the discipline of this religious association; nor could they prevent its use by those who chose to remain in the church and who represent the regular church organization. If complainants maintain the allegations of their bill, that they represent the regularly organized body of the church, and are its regular appointees, they are entitled to the relief prayed.' ''

In *Permanent Committee of Missions* v. *Pacific Synod*, 157 Cal. 105, at page 128 [106 Pac. 395, 403], the court quotes with approval as follows: '' 'Whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of the church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.' (*Watson* v. *Jones*, 80 U. S. [13 Wall.] 727 [20 L. Ed. 666].)'' Some courts have applied that same rule and when, as here, the ecclesiastical judicatory has determined the validity or invalidity of the amendments, such determination is binding on the courts. (*Lamb* v. *Cain*, 129 Ind. 486 [14 L. R. A. 518, 528, 529, 29 N. E. 13]; *Mattson* v. *Saastamoinen*, (1926) 168 Minn. 178 [209 N. W. 648].) Finally, other cases are to be found which reach the same conclusion but through a slightly different reasoning. In *Landrith* v. *Hudgins*, 121 Tenn. 556 [120 S. W. 783], at page 792, the Supreme Court of Tennessee said:

"It may be for the good of the church, under some circumstances that may be conceived, to dissolve the organization, or to unite with another church on such terms as may be agreed upon. Such union may involve a change of name, or faith, or both. The constituent contract, the constitution, may point out how both of these ends may be effected, and, if so, must be complied with. After these changes have been made there may still remain the organization—the framework of the church which must, in effect, be dissolved, by the act of union with another church. The authority to effect this must be found where the supreme legislative power of the organization resides, because it requires the exercise of the will, and the expression of the will of the

whole organization as a unit, on a proposition affecting the whole in respect of its existence and organic activity. There being a question for the whole church, it cannot be a matter to be determined by the individual congregation. The whole church itself is a unit—a composite unit, it is true, but still a unit—and in determining questions addressed to it, it must act in accordance with its nature, by that body or bodies through which it speaks its will.

"The union must be effected in strict accord with the constitution: that is, if it requires a preliminary change of faith and of name, and these changes can only be made by amendment, then such amendment must precede the actual union, and must be made in the manner pointed out in the contract. The principle is that as far as the method is distinctly pointed out it should be pursued." (See, also, *Boyles* v. *Roberts*, 222 Mo. 613 [121 S. W. 805, 821].)

As to these purported amendments the defendants assert that the limitations on the power to amend are not addressed to article XII; hence the defendants had the power to amend section 1, article XII; having eliminated the last clause by their purported amendment, they assert they had the right to make the other amendments. Such reasoning assumes that the Los Angeles church was not otherwise under contract. If it had not been the reasoning might have efficacy. But, having first adopted its constitution and that constitution having been incorporated in the larger contract as between each member and each of the governing entities, the reasoning adopted by the defendants finds no support in the authorities which we have cited above.

In this connection the defendants stress the first two paragraphs of the conclusions of law as made by the trial court. Those paragraphs are to the effect that the acts of the "defendants were no departure by the defendants from the doctrines and practices of the Lutheran denomination". But the vice in that reasoning is that the judicatory of the denomination has found otherwise and the courts may not substitute their opinions in lieu of the determinations of the authorized tribunals of the church.

Something is said about majorities and minorities. If we are correct in selecting the classification, under *Watson*

v. *Jones, supra,* it is immaterial whether the plaintiffs constitute a large or small minority of all the members of the church, they represent the church. (*Baker* v. *Ducker,* 79 Cal. 365, 374 [21 Pac. 764] ; 34 Cyc. 1164.)

But the defendants claim the plaintiff was organized as an independent congregation. There is no conflict in the evidence. It is to the contrary. The most that the evidence shows is that originally the church was organized subordinate to the General Synod; but at that time there was no District Synod. Later the plaintiff church and others organized the District Synod. The fact that the church was incorporated did not make it an independent congregation. (*Wheelock* v. *First Presbyterian Church,* 119 Cal. 477, 485 [51 Pac. 841].) Furthermore, even though it was independent in the beginning, that status was clearly changed by the new contract. It is said there has not as yet been any change of doctrine and discipline. But the Synod has decided that there has been. That ruling is conclusive. (*Permanent Committee of Missions* v. *Pacific Synod,* 157 Cal. 105, 128 [106 Pac. 395].) Continuing, the defendants assert: ''The constitution, formulas and articles of the various divisions of the Lutheran structure and the powers and limitation therein contained furnish the field of research.'' But, when that field of research is examined, nothing is found helpful to the contention of the defendants.

In nearly every instrument so referred to, if not in every single one of them, passages are to be found showing the existence of ecclesiastical judicatories over and above the church council. When that fact appears, the investigation of a civil court should stop. (*Mack* v. *Kime,* 129 Ga. 1 [24 L. R. A. (N. S.) 675, 687, 58 S. E. 184].) The defendants stress the fact that the synods are to ''advise'' as distinguished from ''command''. When the spiritual nature of this organization is considered, it is clear that the use of the expression, ''advise'', by the framers of the organic instruments under consideration, was intentional and is to be commended and enforced and not belittled. The words selected are easily to be understood and followed.

As opposed to nearly everything we have said, the defendants cite and rely on *Gudmundson* v. *Church,* 29 N. D. 291 [150 N. W. 750]. That case involved the organization, etc., of the Icelandic Lutheran Church of America. It

does not appear that that sect is a branch of, or similar to, the United Lutheran Church. In that case an *ex parte* order was made by the ruling synod. No *ex parte* order was here involved. That case contains some language intimating that the determination by an ecclesiastical tribunal having jurisdiction to act and acting within its jurisdiction, is not conclusive on the courts in matters ecclesiastical. Such is not the rule in California. (*Permanent Committee of Missions* v. *Pacific Synod,* 157 Cal. 105, 128 [106 Pac. 395].)

The plaintiffs claim that there are a large number of findings of fact that are not sustained by the evidence. That is true. Furthermore, there is no conflict in the evidence on any issue which is material to the cause of action.

The judgment is reversed.

Nourse, P. J., and Spence, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 20, 1932, and an application by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 21, 1932.

Curtis, J., dissented.