954

EVANGELICAL LUTHERAN SYNOD OF KANSAS AND ADJACENT STATES v. FIRST ENGLISH LUTHERAN CHURCH OF OKLAHOMA CITY et al.

Civ. No. 997.

District Court, W. D. Oklahoma.

Nov. 10, 1942.

John H. Shirk and James E. Grigsby, both of Oklahoma City, Okl., for plaintiff.

Sam Neff and J. D. Lydick, both of Oklahoma City, Okl., for defendants.

VAUGHT, District Judge.

On March 6, 1942 the Evangelical Lutheran Synod of Kansas and Adjacent States (hereinafter referred to as "the Kansas Synod"), a corporation, as plaintiff, filed its complaint in this cause against First English Lutheran Church of Oklahoma City (hereinafter referred to as "the City Church"), a corporation, Fred H. Bloch, as pastor pretendant of such church, and E. C. Doerr, J. H. Winneberger, Albert Swanson, Stanley Homer, Walter Quick, A. E. Rosenthal, V. H. Smith, and S. C. Hoshour, as members of the Board of Deacons and Trustees, defendants.

The complaint alleges that the City Church, whose membership consists of those subscribing and adhering to the faith and doctrine of the English Lutheran Church, was organized in the year 1902 as an unincorporated religious society and in February, 1903, it obtained a charter from the Oklahoma Secretary of State under the name of the First Evangelical Lutheran Church of Oklahoma City. Thereafter, in April, 1917, it amended its articles of incorporation whereby the name of the First Evangelical Lutheran Church of Oklahoma City was changed to First English Lutheran Church of Oklahoma City and since has been and is now a religious corporate entity, and during all of the time since its organization was and now is an integral and organic part of the plaintiff, as a religious society.

That during the formative period of the City Church, it received substantial monetary and other benefits from the Kansas Synod, as the membership was insufficient to enable self-support and maintenance, and to the end that it be permitted to survive and continue, it became necessary that the Kansas Synod, from time to time, provide funds with which to enable it to exist.

That "approximately two or more years ago, and shortly after the defendant, Fred H. Bloch, became pastor of such church, strife and difference developed among the parishioners by reason of certain acts of the pastor in endeavoring to rule, control and dominate all affairs of the Council, Sunday School, and other activities of the church, and in all respects and particulars dominated, controled, and overruled the desires and wishes of the members of

his Council. Instead of the council being permitted to do and perform the things required of them by the constitution of the Lutheran Church, such pastor coerced and intimidated them to such an extent that they submitted to his desires and wishes. In furtherance of his declared and continued efforts to absolutely control and dominate them, he insisted that the constitution be amended to such an extent as he concluded would vest greater power in the pastor. The committee appointed by him to so recast the constitution, after giving the matter full thought and consideration, declined to rewrite the constitution as would have been in keeping with the wishes of the defendant, Fred H. Bloch, and reported to him that a thorough study justified a conclusion that present arrangements were most satisfactory, and that the ecclesiastical and organic relationship with The Kansas Synod should not be disturbed. The report so made caused the defendant, Fred H. Bloch, as the then pastor, to become so angered that at the following meeting of the congregation whereat certain elders and deacons were elected, he so conducted the same, and so threatened and intimidated those in attendance, that members of his own choosing were elected as elders and deacons. The strife and difference became so acute that the church membership has been divided to such an extent that they are now two separate and distinct factions. One of the factions being in favor of such pastor, and the other faction being in all things opposed to him, and as christians maintained the rich tradition of working harmoniously with the Kansas Synod, and thereby perpetuated the happy ecclesiastical relationship, and such would exist at this time save and except for and on account of the acts of the defendant, Fred H. Bloch, in using his time to foment further strife and discord instead of discharging his duties as the pastor in promoting harmony and concord and so demean himself generally as would result in the general welfare of the congregation. * * * By reason of the acceleration of such strife, the pastor, all members of the council, and some of the parishioners have disregarded, failed to observe, ignored, and treated with impunity, the obligations owing the Kansas Synod and its duly elected officers, and adhere to all provisions of the constitution and by-laws of the Kansas Synod, and particularly subsection 4 of Section 3, of Article 1 thereof, wherein it is provided that: 'Every congregation shall be faithful to its obligations to this Synod in all matters of support, practice, and Church government.' "

That "sometime prior to the 18th day of February, 1942, strife and difference became so intense, and the bitterness of the defendant, Fred H. Bloch, as pastor pretendant, so sharp against the Kansas Synod and a large number of the parishioners, that he caused notices to be published in certain issues of the Sunday Church Bulletin, that during the evening of the first day of Lent, being Ash Wednesday, there would be a meeting of the congregation, and at the conclusion of the evening service conducted on the 18th day of February, 1942, the defendant, Fred H. Bloch, announced that those in attendance should stand convened as a congregation for the purpose of transacting whatever business that might come before those assembled, and at such meeting approximately ninety-four of the parishioners attending such congregational meeting, upon motion inspired by the defendant, Fred H. Bloch, as pastor, declared by vote that the defendant, Lutheran Church of Oklahoma City, and its congregation secede from the Kansas Synod and affiliate with and become a member of the Midwest Synod, which is a synodical religious society, similar to, but in many respects unlike the plaintiff, Kansas Synod. Of those in attendance, approximately twenty-two voted negatively, and as the presiding officer, the defendant Fred H. Bloch, as pastor, declared it to be the act of the congregation that there was a secession from the Kansas Synod and from thence forth the congregation would be an affiliate of and a member of the Midwest Synod."

The petition further alleges that "more than a majority in number of the parishioners of the defendant, Lutheran Church of Oklahoma City, were and are opposed to such secession, and such opposition was definitely known by Fred H. Bloch, as pastor, and by his elders and deacons, prior to and on the date of such meeting of some of the members of the church. Had the defendant, Fred H. Bloch, as pastor, his elders and deacons, and a selected few of his parishioners, given the information alike to all those entitled to receive the same, the attendance at the meeting would have been, in person and by proxy, as near 100% as conditions existing at the time would permit."

It is further alleged that "after the meeting of February 18, 1942, Reverend W. W. Klover, President of the Kansas Synod, called a meeting of the Executive Committee of such Synod, to meet at Emporia, Kansas, on the 26th day of February, 1942, for the purpose of considering and taking action with respect to all matters leading up to the declaration by a few of the parishioners to secede in behalf of all, and all related subjects." That at such meeting of the Executive Committee of the Kansas Synod, a resolution of rejection was passed which resolution is as follows:

"Whereas, by a letter bearing date of February 20, 1942, addressed to Rev. W. W. Klover, President of The Evangelical Lutheran Synod of Kansas and Adjacent. States, and signed by J. H. Winneberger, Secretary of the First Lutheran Church of Oklahoma City, request is made that in consequence of the desire of certain parishioners of such church at Oklahoma City to secede from the Kansas Synod and become a member of and affiliated with the Midwest Synod, be acquiesced in, consented to and approved by said Kansas Synod;

"Now, therefore, be it resolved by the Executive Committee of The Evangelical Synod of Kansas, and Adjacent States, in due and regular session at Emporia, Kansas, on this 26th day of February, 1942, that the action taken by certain members of the First Lutheran Church of Oklahoma City be not recognized as a thing done within the jurisdiction of the minister of such church or those voting to so secede; and,

"Be it further resolved, that the request of the Council expressed by and through their secretary, be denied; and

"Be it further resolved, that the Executive Committee of the Evangelical Synod of Kansas and Adjacent States decline to give its consent and assent to the severance so expressed by some of the parishioners of the Oklahoma City church to withdraw from the Evangelical Synod of Kansas and Adjacent States and affiliate with the Midwest or any other Synod of the United Lutheran Church of America."

The complaint further alleges that "prior to the meeting of the Kansas Synod at Emporia, Kansas, on February 26, 1942, the president appointed a special committee of Lutheran Ministers and others, for the purpose of ascertaining all the facts concerning strife and difference among the parishioners of the Lutheran Church of Oklahoma City, and after thus ascertaining the facts, and reporting to the Synod, the latter declared that those parishioners of the Lutheran Church of Oklahoma City who were opposed to withdrawal or secession constituted the congregation of such church, and further resolved and declared that since the defendant, Bloch, was a party to and had encouraged revolt of some of his parishioners, and since the constitution of the Lutheran Church of Oklahoma City makes all its pastor's conduct amenable to the Synod to which they belong, and the Synod is the tribunal who has the jurisdiction of them, he (Bloch) was suspended for cause and declared no longer pastor of the Lutheran Church of Oklahoma City as of the 26th day of February, 1942. And at such synodical meeting it was also resolved that the recognized and established congregation of the church have a meeting for the purpose of electing officers. and securing a duly ordained minister, approved by the Kansas Synod, to conduct all religious services for and on behalf of the congregation, and to administer Sacraments." The resolution so adopted is set out in full and made a part of the plaintiff's complaint.

It is further alleged that the proceedings of the Kansas Synod, through its executive committee, were made known to the defendant Bloch and to the other defendants named herein; that said defendants refused to recognize the authority of said synod, have taken charge of the church property and all moneys received by the congregation, and began to act and have acted as a congregation independent of the Kansas Synod and have recognized and affiliated with the Midwest Synod.

That the Kansas Synod had a right to expect certain contributions from the City Church for general church purposes, including its regular contribution of approximately $1,400 of benevolences; that the church property is of the reasonable value of $65,000 and all of the members of the City Church, except those acting and affiliating with the said Bloch, are deprived of any interest in or use of said property; and, that if said secession is recognized and permitted to stand, the Kansas Synod, representing all of the churches in its district, will suffer irreparable loss, and the church in general will suffer seriously because of said local secession movement.

On the filing of the complaint, a temporary injunction was issued but later was modified by providing that each of the factions in the church should use the church on alternate Sundays, and this court declined to pass on the issue raised until the judgment and decision of the Kansas Synod had been appealed to the highest judicatory body of the church, to-wit: The Commission of Adjudication of the United Lutheran Church in America (hereinafter referred to as "the Commission").

The defendants have filed their answer admitting many of the allegations but in effect alleging that their procedure in severing connection with the Kansas Synod was legal in all respects, was in strict accord with the rules and regulations of the church in general, and that the congregation seceding from the Kansas Synod is and should be recognized as the First English Lutheran Church of Oklahoma City and entitled to the possession and control of all of its property including the church parsonage, and that it should control also the revenues of said congregation.

The parties, both by oral statements and formal stipulations in writing, have agreed upon the following facts upon which, with briefs, the case has been submitted to the court:

That the City Church is a religious corporation organized under the laws of Oklahoma and that its constitution is that which has been placed in the record in this cause.

That the Kansas Synod and the Midwest Synod are both orthodox synods within the United Lutheran Church in America and are geographically overlapping.

That judicial notice may be taken of the constitutions of the United Lutheran Church in America, the Kansas Synod, the Midwest Synod, and the City Church.

That notice of the special congregational meeting of the City Church on February 18, 1942, was given without indicating that the purpose of the meeting was to consider secession from the Kansas Synod and affiliation with the Midwest Synod.

That a meeting of the church council had been held on January 26, 1942, at which the following record was made: "A motion was made by Stanley Homer, seconded by Walter Quick, and carried, that the council call a congregational meeting as soon as possible to consider and effect a transfer from the Kansas Synod to the Midwest Synod. The motion carried unanimously."

That at the special meeting held February 18, 1942, the following resolution was adopted: "Whereas First Lutheran Church is now a member of the Kansas Synod of United Lutheran Church, and whereas the question as to whether the congregation will withdraw from the Kansas Synod and affiliate itself with the Midwest Synod of the United Lutheran Church in America has received the earnest consideration of the members of the church, the Church Council of this church has recommended that such change be made, and whereas it is the consensus of opinion of the members of this congregation that it would be to the best interests of this congregation that this church withdraw from the Kansas Synod of the United Lutheran Church of America, now therefore be it resolved by the membership of this church in meeting duly assembled pursuant to due and legal notice that this congregation do, and it does hereby withdraw its membership in the Kansas Synod of the U. L. C. A. and it does hereby and by this resolution affiliate itself with the Midwest Synod and declare itself subject to all of the rules and regulations in force in the Midwest Synod of the U. L. C. A."

That by letter of February 23, 1942 the president of the Midwest Synod accepted the congregation pursuant to authority of its executive committee, and that on March 1, 1942 the executive committee, by resolution, accepted the City Church into the Midwest Synod.

That on or about March 7, 1942 the secretary of the church council received a letter from the secretary of the executive committee of the Kansas Synod enclosing a resolution dated February 18, 1942, in which the Kansas Synod refused to consent to the withdrawal of the City Church from the Kansas Synod.

That on May 7, 1942, the Midwest Synod appealed from the action of the Kansas Synod, in denying the right of the City Church to withdraw therefrom, to the Commission which appeal submitted three questions for determination as follows, to-wit:

"(1) In order that the congregation of the First English Lutheran Church of Oklahoma City might withdraw from the Kansas Synod and join the Midwest Synod,

both of which are orthodox synods, was it necessary that the congregation obtain the consent of the Kansas Synod?

"(2) Did the Constitution of the above Oklahoma City church require that the purpose of the congregational meeting of February 18, 1942 be stated in the notices of the meeting, as a prerequisite to validity of the resolution to withdraw from one synod and join the other?

"(3) Is the First English Lutheran Church of Oklahoma City now a congregation within the Midwest Synod?"

On June 25, 1942 the Commission rendered its decision in writing, which decision was incorporated in and set out in the supplemental complaint of the plaintiff.

On the first question raised on the appeal, the Commission made the following observations: "The question is fundamentally one in Lutheran Church Polity. The argument of proponent is that, inasmuch as no change of doctrine is involved, the Oklahoma City Church had the right to withdraw from the Synod of Kansas and unite with the Synod in the Midwest at any time, regardless of any laws of the said Synod of Kansas to the contrary. The Commission of Adjudication is of the opinion that the general exercise of such a right *should be discouraged* as *destructive* of *sound* church government in the United Lutheran Church in America. Congregational rights assume different forms in different lands. The fundamental principle has been clearly stated by Dr. Henry E. Jacobs in these words: 'The Church having no power but that of the Word, all synodical power is simply that of administering the means of grace, and testifying to the truth. In regard to arrangements for the collection and administration of funds, the arrangement of parishes, the adoption of uniform measures to advance church interests, the synod has no more power than the congregations uniting in synod confer, when they accept the synodical constitution. *But here, as in all other associations, obligations thus assumed are to be fulfilled,* unless they oppress consciences, when the remedy lies first in protest, and then in regular withdrawal. *No pastor or congregation can justly avail himself of the rights and privileges of membership in a synod, without complying with its rules, aiding in bearing burdens, and cooperating in all its interests.'*" (Emphasis supplied.)

The Commission then held: "* * * that a *categorical* answer to the first ques-

tion would involve the determination by it of *civil law* as well as ecclesiastical law and church polity, since the *ultimate* decision *may depend* upon the question of the *legal* effect of any inconsistencies there may be between the constitution of the Synod and that of the congregation." (Emphasis supplied.)

The Commission then confined itself to the pronouncement of certain principles of church polity and with a fine sense of candor and propriety, recognized that it cannot give a categorical answer to the first question raised on appeal, as it might be invading the province of the court in passing upon the rights of the parties under civil law, particularly the laws of the land where the question arises. It therefore contented itself with setting forth principles of church polity for the guidance of the court in rendering an opinion on the facts involved.

In other words, the highest judicatory body of the church, in answering the first question which was submitted to it by the Midwest Synod in its appeal from the action of the Kansas Synod, while somewhat evasive, most certainly did not reverse the Kansas Synod in any of its rulings. It stated that the action of the local congregation in withdrawing "should be discouraged as destructive of sound church government in the United Lutheran Church in America." Certainly this learned body did not mean by using those words to approve what was "destructive of sound church government" but the effect of the Commission's ruling was to sustain the action of the Kansas Synod.

As to the second question submitted, the Commission answered as follows: "Neither the constitution of the Oklahoma City Church nor the 'Formula for the Government and Discipline of Congregations' of the General Synod requires that the purpose of a special meeting be stated in the announcements of such meeting. Unless such a requirement is specifically set forth, it cannot be held to be a prerequisite to the validity of any action taken at such meeting."

As to the third question, the Commission held that its answer to question one in effect covers question three.

The parties have stipulated that, in so far as material and pertinent to the issues involved, the decisions of the Commission announce the law of the church and are binding upon the parties to the suit.

It also was stipulated that the membership of the City Church (including infants and without regard to whether they had been confirmed or had communed) on December 1, 1940 numbered 581 and on December 1, 1941, 608; that the confirmed members (without regard to whether they had communed) on December 1, 1940 numbered 467 and on December 1, 1941, 485; and that the communing members (those communing during the last preceding year) on December 1, 1940 numbered 292 and on December 1, 1941, 250.

█ It is a settled rule that where church tribunals, having jurisdiction of such causes in so far as church polity is concerned, have passed upon questions involved in a cause, such decisions are binding upon the civil courts. Particularly is this true when the question is one that involves discipline, faith, ecclesiastical rule, custom or church government. All the authorities seem to be in agreement in this regard. The principle is well expressed in Permanent Committee of Missions v. Pacific Synod, 157 Cal. 105, 106 P. 395, 403, where that court said: "We approve the principle laid down by the Supreme Court of the United States in Watson v. Jones, supra [13 Wall. 679, 80 U.S. 679, 726, 20 L.Ed. 666], and by the Supreme Court of this state in Horsman v. Allen, supra [129 Cal. 131, 61 P. 796], relating to this subject. 'Whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of the church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.' Watson v. Jones, supra."

The record discloses that the City Church was organized forty years ago. It was incorporated under the laws of Oklahoma and then voluntarily became a member of the Kansas Synod. Since that time up to February 18, 1942, that relation remained unbroken. For forty years it has been represented in the conventions of that synod and assisted in making the laws that govern it. At the time of the proposed withdrawal, it was governed by the provisions of the constitution of that body and was amenable to those provisions. As Dr. Jacobs so well said of such a relation, "*obligations* thus assumed are to be *fulfilled*, unless they oppress consciences, when the remedy lies first in protest, and then in regular withdrawal." And again, "no pastor or congregation can justly avail himself of the rights and *privileges of membership* in a synod without complying with its rules, aiding in bearing its burdens and cooperating in all its interests."

The plaintiff contends that its decision is consistent with the constitutions of the local church, the Kansas Synod and the general church, and since these various constitutions become important in deciding the issues involved, certain pertinent portions of these constitutions are set out as follows:

The constitution of the United Lutheran Church in America provides:

Article VI, Section 6. "To foster and develop the work of Synods, to exercise a general supervision of the Church, and on appeal of Synods to give counsel and to adjudicate questions of doctrine, worship and discipline."

Article VIII, Section 2. "As to Internal Relations. The United Lutheran Church in America shall have power to deal with internal matters that affect all its constituent Synods or the activities of The United Lutheran Church as a whole, except that when the operation of such power takes place within the domain of any of the Synods their consent and cooperation must first be secured."

"Section 6. As to the Maintenance of Principle and Practice. The United Lutheran Church in America shall protect and enforce its Doctrinal Basis, secure pure preaching of the Word of God and the right administration of the sacraments in all its Synods and congregations. It shall also have the right, where it deems that loyalty to the Word of God requires it, to advise and admonish concerning association and affiliation with non-ecclesiastical and other organizations whose principles or practices appear to be inconsistent with full loyalty to the Christian Church, but the Synods alone shall have the power of discipline."

Article XIV. "Section 1. No Synod in connection with the United Lutheran Church in America shall alter its geographical boundaries without the permission of the general body."

"Section 2. Synods shall give advice to their ministers and congregations concerning doctrine, life and administration, and shall exercise such disciplinary measures as may be necessary."

"Section 3. The Presidents of Synods shall exercise an oversight of the pastors and congregations composing their respective Synods, and shall be charged with the duty of carrying out the rules and regulations adopted by the Synods. When requested by the Executive Board they shall appear before it to represent their Synods. They may also make suggestions to the Executive Board, or seek its advice, with respect to the conditions and work in their Synods."

The Constitution of the Kansas Synod provides:

Article One, Section 3, subsection 1. "This Synod shall consist of ministers and congregations in unity with the Doctrinal Basis in Section 2 received into membership as hereinafter provided."

Subsection 2. "Any Evangelical Lutheran minister applying for admission into this Synod and accepting this constitution with its Doctrinal Basis and who holds a letter of honorable dismissal from the President of the Synod from which he comes may upon recommendation of the Examining Committee be received into membership."

Subsection 3. "Any congregation located within or contiguous to the natural bounds of the territory of this Synod may upon the approval of the Executive Committee of Synod be received into membership by a majority vote at any regular convention."

Subsection 4. "Every congregation shall be faithful to its obligations to this Synod in all matters of support, practice, and Church government."

Section 4, subsection 7. "To ordain fitted men for the Holy Office of the ministry of the Gospel; and to suspend and depose those who dishonor it by false teaching, by insubordination, or an unworthy or wicked life."

Subsection 8. "To maintain discipline unto the fostering of holiness and fidelity in the ministry and people."

Article Six, Section 1. "1. All applications for ordination shall be made to the President and referred by him to the Examining Committee which shall report on the same to the Synod and upon the recommendation of a two-thirds vote of the Synod may become members of this Synod."

"2. Every minister received into the Synod and every candidate who is ordained shall subscribe to this Constitution prior to admission into membership."

Section 2. "1. A congregation desiring admission into the Synod shall place into the hands of the President a formal application signed by the Secretary of the Church Council and by the pastor, and shall send a representative to the meeting of the Synod; it shall submit a copy of its Constitution, and of its Charter, if Incorporated. If these are in accord with the requirements of the Constitution of the Synod, the congregation may be received into membership by a majority vote of the Synod at any regular meeting. Contemplated changes of its Constitution affecting its articles of faith, adherence to the Synod, and the United Lutheran Church in America, and disposition of its property, shall be reported to the President for his approval."

Article Eight. "1. It shall be the duty of the Church Council or Councils of every pastorate belonging to the Synod to appoint annually from its communicant members in good standing a lay delegate who shall represent the pastorate at all meetings of Synod and of Conference and submit his report to the pastorate; and the congregation or pastorate shall arrange to pay his and their pastor's expenses incurred by their full attendance upon such meetings. It may also appoint an alternate to take the place of the regular delegate in his absence.

"2. Every congregation belonging to the Synod, as it has a share in all its acts and supervisions, shall comply with the Constitution, By-Laws, decisions and recommendations of the Synod and local Conference, and conform to its public worship and ministrations to the order used by the United Lutheran Church in America and approved by the Synod. It shall observe and make systematic effort to meet at least the apportionment for all objects to the Treasurer of Synod, and afford to all its members a regular channel of contributions for the benevolent operations of the church, the minimum amount being indicated by a budget of apportionment by Synod to the congregation. It shall make earnest effort to pay such amounts into the Synodical Treasury in monthly installments. It shall make due and liberal provisions for the ministration of the Word and the Sacraments, endeavor to hold at least one service every Lord's Day and see that the pastor is properly supported; and make all necessary provision for the promotion of

piety in its families and for the Christian training of the young.

"3. In cases of vacancy, difficulty or strife in a congregation the Church Council shall seek the advice and instruction of the President of Synod.

"4. In case of strife or division, should any part of a congregation or pastorate belonging to the Synod reject the faith set forth in Article One, Section II, or revolt against the Constitutional provisions or its obligations as a member of the Synod, that part of the congregation or pastorate, whether majority or minority, of its membership which continues in unity with the Synod and its faith shall be recognized as the lawful congregation or pastorate.

"5. No congregation shall make any enactments in conflict with this Constitution or with the accepted regulations of the United Lutheran Church in America.

"6. Should a pastor resign, the Church Council shall receive the letter of resignation and at once report the fact to the President of Synod."

The Constitution of the First English Lutheran Church of Oklahoma City provides:

Article II. "Its Doctrinal Basis, and Formula of Government and Discipline, shall be those of the General Synod of the Evangelical Lutheran Church in the United States of America, and it shall always be connected with a District Synod of the said General Synod."

Article III. "Section 2. Every church-member is amenable to the Council, and must appear before them when cited, and submit to the discipline of the church regularly administered."

"Section 3. It is the duty of every church-member to lead a Christian life; that is, to perform all the duties required of him or her in Scripture. Thus it is the duty of adults to perform all the Christian Duties; to attend the public worship of God, and to partake of the Lord's Supper whenever an opportunity is afforded. It is the duty of parents to educate their children in the nurture and admonition of the Lord, to teach them the doctrines of the church, and to subject them to the ordinances of the same."

Article IV. "Section 3. Pastors are amenable for their conduct to the Synod to which they belong; and that Synod is the tribunal which has the entire jurisdiction over them; excepting in those cases where a regular appeal is obtained to the General Synod, agreeably to Article IV, Section 8, of the Constitution of the General Synod."

Article VI. "Section 1. The Church Council is the lowest judicatory of the Church, consisting of the pastor, or pastors, and all the elders and deacons of a particular church."

"Section 12. In all cases of appeal from the decisions of the Church Council, the Council shall take no further measures grounded on their decision until the sentence has been reviewed by the Synod. But if the decision appealed from be a sentence of suspension or excommunication, it shall immediately take effect and continue in force until reversed by the Synod. And in every case of appeal, the Church Council shall send a detailed and correct account of the proceedings in the case, and of the charges and evidence on both sides."

In the case of First English Evangelical Lutheran Church of Los Angeles et al. v. Dysinger et al., 120 Cal.App. 139, 6 P.2d 522, 523, the District Court of Appeal of California, in December, 1931, reviewed at length the constitution of the United Lutheran Church in America and said: "From these documents it is apparent that the individual is to be allowed the utmost liberty, but that the doctrines of the church are to be preserved; that, unto that end, the church is governed by three judicatories: the council of each individual church, the district synod, and the general synod. One of the powers of the district synod is to ordain ministers, to suspend and depose them for cause after a trial duly had, and to exercise other powers of discipline. Before any church can become a member of the district synod it must submit its constitution for approval."

That court also quoted from Watson v. Jones, 13 Wall. 679, 80 U.S. 679, 20 L. Ed. 666, a leading case on religious controversies which involved the question of the right to church property as in the case at bar, and stated that it involved "* * * property purchased for the use of a religious congregation, and so long as any existing religious congregation can be ascertained to be that congregation, or its regular and legitimate successor, it is entitled to the use of the property. In the case of an independent congregation we have pointed out how this identity, or succession is to be ascertained, but in cases

of this character we are bound to look at the fact *that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments."* (Emphasis supplied.)

Continuing, the California court said: "* * * the district synod has decided the controversy in favor of the plaintiff in this case. It follows that the judgment of the trial court should have been for the plaintiff. But the defendants assert that before the district synod rendered its decisions the defendants amended their constitution and withdrew. The point is not well taken for several reasons. To pass each amendment required a unanimous vote. It was not had on any one of the amendments. The first, second and third amendments as printed above needed the *approval of the president of the synod.* That approval was not had." (Emphasis supplied.)

See Borgman v. Bultema, 213 Mich. 684, 182 N.W. 91, and Fuchs v. Meisel, 102 Mich. 357, 60 N.W. 773, 32 L.R.A. 92.

In Nagle et al. v. Miller et al., 275 Pa. 157, 118 A. 670, decided by the Supreme Court of Pennsylvania in September, 1922, a very similar question arose in the Lutheran Church and the question there was whether those seceding would be entitled to the property or whether those remaining loyal to the synod (as provided in the constitution of the Kansas Synod) would be entitled to possession of the property. Quoting from the syllabus, the court held:

"1. In the event of a division of a church congregation, the title to its property vests in that faction, whether the majority or minority, which continues to act in harmony with the laws, usages, and customs accepted by the body before the dispute arose.

"2. An independent church organization is governed by the majority of its own membership so long as they act within the purposes of the organization; but, if a church congregation is connected with a given denomination or creed, it is bound, not only by its own rules and laws, but by the laws and usages of the particular sect or ecclesiastical organization with which it is affiliated, provided the action of the general governing body is not contrary to the general doctrine and laws of the church."

In the third paragraph of the syllabus the court held that a congregation of the Evangelical Lutheran Church was an "associated church in union with the Ministerium, Conference, and General Council, and subject to the order and discipline of the denomination and synod to which it belonged, and not authorized to divert its property from the purposes of that organization."

In Kelly et al. v. McIntire et al., 1938, 123 N.J.Eq. 351, 197 A. 736, 737, the court, in dealing with a controversy in the Presbyterian Church, held, quoting from the syllabus: "The attempt of a local congregation to withdraw from the established denomination under which it was organized, and take away the property acquired while a member of the denomination, is ineffective without the latter's consent; property so acquired is impressed with a trust for the benefit of the denomination."

In another New Jersey case, True Reformed Dutch Church of Paramus v. Iserman et al., 64 N.J.L. 506, 45 A. 771, 772, the court said: "The title to property acquired by the association before the existence of a schism will remain in that faction of the association which abides by the doctrine, principles, and rules of the church which the united body professed when the property was acquired."

The general rule as to withdrawal of a denominational church is laid down in section 65, 54 Corpus Juris 36, as follows: "Where the church is an integral part of the general organization, and has a direct, inherent, and organic interest in that body, it is forever a part of it, except where its rights are forfeited by a regular judicial decree, or the connection is broken by mutual consent of society and the superior body, a society even though it has voted in favor of secession still remaining a part of the larger body until the secession has been acted upon by the larger body in conformity to its own rules."

The Kansas Synod, in its pronouncements of February 26, 1942, held:

"1. The First Lutheran Church of Oklahoma City is an integral part of the Evangelical Lutheran Synod of Kansas and Adjacent States, which has a direct and inherent interest in such church and its congregation, and must obediently observe and comply with the letter and spirit of the constitution and by-laws thereof.

*     *     *     *     *

"At the inception of the First Lutheran Church of Oklahoma City, it became and now is an integral part of the Evangelical Lutheran Synod of Kansas and Adjacent States * * * and must forever remain a part of it, except where its connection may be broken by mutual consent of such church and the Kansas Synod. Attempts made by the active minister and those parishioners who joined with such minister in seeking withdrawal without the consent of the Synod, constitute and are a direct revolt against the constitution and by-laws of the Evangelical Lutheran Synod of Kansas and Adjacent States."

The Kansas Synod has a provision in its constitution, as hereinbefore stated, which in so far as it affects this situation in substance would read: "Contemplated, changes of its Constitution affecting * * * *adherence to the Synod* * * * and *disposition of its property,* shall be reported to the President for his approval." (Emphasis supplied.)

This provision in the by-laws of the Kansas Synod is in harmony with a provision of the constitution of the United Lutheran Church in America, supra: "The Presidents of Synods shall exercise an oversight of the *pastors* and *congregations* composing their respective Synods, and *shall be charged with the duty of carrying out the rules and regulations* adopted by the Synods. * * * *"* (Emphasis supplied.)

When the action of any organization must be reported to any higher official, or organization, for approval, that higher official, or organization, of necessity has the right and the power to approve or disapprove that action.

The Midwest Synod, through its president, Herman Goede, as shown in exhibit B attached to his deposition in this cause, apparently knew of the provisions of the by-laws of the Kansas Synod upon the date of the communication to the council of the City Church, February 16, 1942. He recognized the authority and duty of the president of the Kansas Synod when he used this language in that letter: "In reference to the change of afflication (sic) of your congregation from the Evangelical Lutheran Synod of Kansas and Adjacent States to the Evangelical Lutheran Synod of the Midwest (both being afflicated (sic) with the United Lutheran Church in America) the following *has been anticipated;* that in all probability the *letter of transfer* will *not* be granted by the Kansas Synod. At our recent meeting of the Executive Committee of *our Synod* this *probability was discussed* and *we* were unanimously agreed that the *letter of transfer* would *not* be *absolutely necessary* for your *reception* into the Midwest Synod." (Emphasis supplied.)

This letter would indicate that both the president of the Midwest Synod and its executive committee were thoroughly conversant with the provisions of the constitution and by-laws of both the Kansas Synod and the United Lutheran Church in America, and that they were assisting and advising the defendants in this cause in seeking to effect the transfer. Here we have the officers of the Midwest Synod, two days before the action of the City Church, in effect advising that church that the provisions of the by-laws of the Kansas Synod might safely be ignored. The whole matter was investigated and considered by the disciplinary committee of the Kansas Synod and its report made to the 74th Annual Convention of the Kansas Synod on April 16, 1942, and the report was duly adopted. This report is a part of the record submitted on appeal to the Commission. The Commission had the benefit of this information and said nothing that indicated it was not in accord with the ruling of the Kansas Synod. No doubt this portion of the record was considered by the Commission and caused it to make the preliminary observation: "The Commission of Adjudication is of the opinion the general exercise of such right" (to withdraw from one Synod and unite with another) "should be *discouraged* as *destructive* of sound church government in the United Lutheran Church in America." (Emphasis supplied.)

Such conduct as displayed by the Midwest Synod, it being a synod of concurrent and overlapping territorial jurisdiction, appears to the court as highly destructive of that harmony that makes for sound church government and should be discouraged.

When the City Church was organized and incorporated under the laws of Oklahoma, it became amenable to the state or territorial laws governing such bodies. Surely no one would take the position that the church could conduct itself in such a manner as to violate those laws and not be subject to be called to account for such violation.

The City Church at the same time became affiliated with the Kansas Synod. For forty years it has so affiliated.' It has had its part in formulating the rules and regulations of the Kansas Synod that governed both its own congregation and all the other congregations of that synod. Under those provisions the church grew and prospered. Many members, who have now passed on, made great contributions in money and personal service to its growth and development. Many remain that saw its beginning and have worshipped all these years at its altar. It has taken its place under its affiliation with the Kansas Synod as one of the leading forces for good in the community. It has prospered both spiritually and materially. Out of the sacrifices of its members, it has erected a house of worship of the reasonable value of $65,000. The pioneer and current members each and all have had a part in building this fine institution. It occurs to the court from this record that the real difficulty, now and for some years past, is and has been a lack of harmony between the membership and the pastor. Churches frequently fall into such difficulty; many members are more interested in the fortunes or misfortunes of a pastor's career than they are in the progress of the church. They seem to feel they have joined the pastor instead of the church.

At the time the church meeting was called to consider this important matter, only 94 members of a total unquestioned membership of 250, who had a right to vote, voted in favor of the resolution to transfer from the Kansas Synod to the Midwest Synod, and 22 voted against it. It is admitted that the notice to the membership of this important meeting was silent as to the purpose of the meeting, otherwise a great number of the 134 absent members might have been present, and the resolution might have been defeated. It may be observed that in addition to the 250 members who were in "good standing" by virtue of the single fact that they had "communed" during the preceding year, there were 235 members who were in good standing except for the fact they had not "communed" during the preceding year. These 235 members in all probability were as much supporting members as any of the "communing" members.

So, the proposition that 94 members out of a total membership of 485 removed this congregation with *all* its church property from the Kansas Synod to the Midwest Synod, was not approved by the Kansas Synod under whose jurisdiction the congregation existed.

The City Church availed itself of all the rights and privileges of membership in the Kansas Synod, and was under the highest obligation to comply with its rules and regulations. It also was obligated to aid in its burdens and to co-operate in all its interests. To hold otherwise would open the door to all kinds of disruption in church government. Strife and turmoil would obtain and frequently a small but active group could wreck and ruin both the church organization and its property.

The consent of the Kansas Synod to the transfer to the Midwest Synod was not given. The action of the City Church was disapproved specifically by the Kansas Synod for reasons, it occurs to the court, which are amply sustained by the record in this cause, as disclosed by the minutes of the meeting of the executive committee of the Kansas Synod under date of February 26, 1942 and incorporated in the record on appeal to the Commission, at pages 81 to 85, inclusive. The court is entirely in accord with what was done and the conclusion reached in that meeting. As hereinbefore stated, the action of the Kansas Synod has not been disapproved or reversed by the Commission, the highest judicatory body of the church.

On the second question, the Commission held that it was not a necessary prerequisite under the provisions of the constitution and by-laws existing, that the purpose of the special meeting should have been stated in the call to give validity to the meeting. Under the state of the record, the ruling of the Commission in this regard is correct. But the court cannot refrain from making some observations generally on that phase of the controversy.

On the action of that special meeting many rights and privileges, both as to church property and church harmony, were involved. When such important rights and privileges were to be determined at a special meeting, it occurs to the court that the greatest care should have been exercised to see that every member of the church was advised concerning what might be discussed and determined in such a meeting. Orderly procedure in general would suggest it, the Golden Rule commands it, and justice should exact it.

It is the opinion of the court that in attempting to withdraw its membership in the Kansas Synod, the City Church did not follow the laws and procedure of the Kansas Synod, and by reason thereof, the Kansas Synod through its proper official disapproved that action; that the action of the Kansas Synod not having been reversed by the highest judicatory body of the church, is a final decision and the City Church is still a member of the Kansas Synod; and, that the resolution of the executive committee of that synod, in the meeting of February 26, 1942, must govern the future conduct of the City Church in the matter involved in this cause.

A permanent injunction is hereby granted to the plaintiff as prayed, and an exception will be allowed the defendants. Findings of fact, conclusions of law, and a form of decree, consistent with this opinion, may be submitted within fifteen days from this date.